QUINN EMANUEL URQUHART & SULLIVAN, LLP

Amar L. Thakur (SBN 194025)
amarthakur@quinnemanuel.com
5095 Rancho Quinta Bend
San Diego, CA 92130
Tel: (213) 443-3000
Fax: (213) 443-3100

Christopher Tayback (SBN 145532)
christayback@quinnemanuel.com
865 S. Figueroa St., 10th Fl.
Los Angeles, CA 90017
Tel: (213) 443-3000
Fax: (213) 443-3100

Jane M. Byrne (NY 2266443)
janebyrne@quinnemanuel.com
Guyon H. Knight (NY 5003108)
guyonknight@quinnemanuel.com
Jonathan E. Feder (NY 5409172)
jonathanfeder@quinnemanuel.com
Shira A. Steinberg (NY 5695580)
shirasteinberg@quinnemanuel.com
51 Madison Ave., 22nd Fl.
New York, NY 10010
Tel.: (212) 849-7000
Fax: (212) 849-7100

*Attorneys for Defendant Allied World Surplus Lines Insurance Company*

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| AMERICAN CLAIMS MANAGEMENT, INC., <br><br> Plaintiff and Counterclaim-Defendant, <br><br> v. <br><br> ALLIED WORLD SURPLUS LINES INSURANCE COMPANY (f/k/a Darwin Select Insurance Company), <br><br> Defendant and Counterclaimant. | Case No. 18-CV-00925 JLS (MSB) <br><br> **REPLY IN FURTHER SUPPORT OF ALLIED WORLD'S MOTION FOR SUMMARY JUDGMENT** <br><br> Date: December 19, 2019 <br> Time: 1:30 p.m. <br> Judge: Hon. Janis L. Sammartino <br> Courtroom: Courtroom 4D <br><br> **REDACTED** |

**TABLE OF CONTENTS**

**Page**

I. PRELIMINARY STATEMENT ................................................................................ 1
II. ACM's Claim Is Excluded ........................................................................................ 1
    A. ACM's Interpretation Of The Claims Services Exclusion Has No Basis In The Policy Language Or The Law ................................................... 1
    B. ACM Has No Response To The Dishonest Act Exclusion ....................... 4
    C. The Contract Exclusion Bars Coverage ...................................................... 4
    D. ACM Concedes That Allied World Is Entitled To Reimbursement ......... 5
III. ACM's Bad Faith Claim Fails On The Law And The Facts ................................ 5
    A. There Was Never A Substantial Likelihood Of An Excess Judgment ........................................................................................................... 5
    B. Allied World Acted Reasonably With All Three Settlement Demands .............................................................................................................. 6
    C. None Of ACM's Other Mischaracterizations Salvage Its Claim ............... 8
IV. ACM's Failure To Defend Claim Would Invent New Law ................................. 9
V. Allied World Satisfied Its Duty To Indemnify ....................................................... 10
VI. CONCLUSION ........................................................................................................... 10

# TABLE OF AUTHORITIES

**Page**

## Cases

*Ambrosio v. Certain Underwriters at Lloyd's*,
    2012 WL 12540015 (N.D. Cal. Mar. 29, 2012) ........................................................ 2

*Beltran v. Allstate Ins. Co.*,
    2001 WL 741806 (S.D. Cal. June 25, 2001) ........................................................... 8

*Blakenbaker v. Progressive Casualty Insurance Co.*,
    2012 WL 12507762 (C.D. Cal. Dec. 17, 2012) ...................................................... 6

*Crisci v. Security Insurance Co. of New Haven, Conn.*,
    426 P.2d 173 (Cal. 1967) ......................................................................................... 6

*Dorroh v. Deerbrook Ins. Co.*,
    223 F. Supp. 3d 1081 (E.D. Cal. 2016) .................................................................. 9

*Graciano v. Mercury Gen. Corp.*,
    179 Cal. Rptr. 3d 717 (Ct. App. 2014) ................................................................... 8

*Greenwich Ins. Co. v. Media Breakaway, LLC*,
    2009 WL 2231678 (C.D. Cal. July 22, 2009),
    *aff'd*, 417 F. App'x 642 (9th Cir. 2011) .................................................................. 4

*Greenwich Ins. Co. v. Medical Mutual Insurance Co.*,
    88 F. Supp. 3d 512 (E.D.N.C. 2015),
    *aff'd*, 667 F. App'x 385 (4th Cir. 2016) .................................................................. 3

*Harper Constr. Co., Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*,
    377 F. Supp. 3d 1134 (S.D. Cal. 2019) .................................................................. 5

*Highlands Ins. Co. v. Cont'l Cas. Co.*,
    64 F.3d 514 (9th Cir. 1995) ..................................................................................... 6

*Hilb Rogal & Hobbs Ins. v. Indian Harbor Ins.*,
    379 F. App'x 609 (9th Cir. 2010) ........................................................................... 2

*Hodges v. Standard Acc. Ins. Co.*,
    18 Cal. Rptr. 17 (Ct. App. 1961) ............................................................................ 6

*Home Ins. Co. v. Gates McDonald Co.*,
    No. 01-cv-7365, Dkt. 259 (C.D. Cal. June 21, 2004) ........................................... 2

*Jalbert v. XL Ins. Am., Inc.*,
  2018 WL 4850403 (C.D. Cal. June 7, 2018),
  *adopted*, 2018 WL 4850382 (C.D. Cal. July 16, 2018) ................................................................ 2

*Jeff Tracy, Inc. v. U.S. Specialty Ins.*,
  636 F. Supp. 2d 995 (C.D. Cal. 2009) ........................................................................ 2

*Levi Strauss & Co. v. Aetna Cas. & Sur. Co.*,
  237 Cal. Rptr. 473 (Ct. App. 1986) .......................................................................... 3

*Mid-Century Ins. Co. v. Bash*,
  259 Cal. Rptr. 382 (Ct. App. 1989) .......................................................................... 1

*Mirpad, LLC v. Cal. Ins. Guarantee Ass'n*,
  34 Cal. Rptr. 3d 136, 147 (Ct. App. 2005) ................................................................ 1

*Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. Markel Ins. Co.*,
  2018 WL 5095267 (C.D. Cal. Sept. 27, 2018) ............................................................ 5

*Pureco v. Allstate Indem. Co.*,
  2018 WL 7143624 (C.D. Cal. Nov. 27, 2018) ............................................................ 5

*Richards v. Neilsen Freight Lines*,
  810 F.2d 898 (9th Cir. 1987) .................................................................................... 7

*Travelers Ins. Co. v. Lesher*,
  231 Cal. Rptr. 791 (Ct. App. 1986) .......................................................................... 8

**Statutes**

Cal. Civ. Code § 2860(c) ............................................................................................ 9

**Other Authorities**

6 Witkin, Cal. Proc. 5th § 566 .................................................................................. 10

## I. PRELIMINARY STATEMENT

ACM misrepresents the record and asks this Court to invent a host of new legal rules to salvage claims that should be dismissed based on well-established law and the undisputed documents and testimony. Stripped of ACM's rhetoric, the record shows that Allied World worked together with ACM at every step. Allied World did not reject ACM's claim, even though numerous exclusions applied from day one. Allied World appointed competent counsel to defend ACM against bad faith exposure, and consented to the plan developed by Jampol and ACM's Schraner to obtain an assignment from QBE's policyholder. Allied World's counsel worked cooperatively with ACM on settlement demands—indeed, ACM never requested that Allied World accept any demands. Finally, Allied World timely paid ACM its full policy limits subject to a reservation of rights. ACM's unsupported arguments cannot create a genuine issue of material fact. The record is clear and it warrants summary judgment.

## II. ACM'S CLAIM IS EXCLUDED

### A. ACM's Interpretation Of The Claims Services Exclusion Has No Basis In The Policy Language Or The Law

The Policy's unambiguous claims services exclusion bars coverage. (Mem. 14-17.) ACM tries to rewrite the Policy in numerous ways, none of which has merit.

*First*, all of ACM's arguments would render the exclusion a nullity, which is contrary to California law. (Mem. 16.) ACM asserts that this rule can be ignored because the exclusion is part of a form policy, and thus may have meaning in *other* contracts issued to *other* policyholders. (Opp. 22.) But "[a] standard form of insurance policy is governed by the ordinary rules of interpretation of contracts." *Mid-Century Ins. Co. v. Bash*, 259 Cal. Rptr. 382, 385 (Ct. App. 1989); *see also Mirpad, LLC v. Cal. Ins. Guarantee Ass'n*, 34 Cal. Rptr. 3d 136, 138, 147 (Ct. App. 2005) (applying rule against nullities to standard CGL policy). ACM's argument also misconstrues the record, which confirms that the claims services exclusion was not simply a form, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. (AW Ex. 5 at 756; AW Ex. 90 at 26:10-27:7.) This

Court should therefore follow the "language of the policy [which] is the best indicator of a party's reasonable expectations, especially when both parties are sophisticated insurance entities that negotiated the terms of the policy." *Hilb Rogal & Hobbs Ins. v. Indian Harbor Ins.*, 379 F. App'x 609, 611 (9th Cir. 2010) (citations omitted).

*Second*, ACM references irrelevant interpretive rules. ACM argues that exclusions should be read narrowly (Opp. 22), but ACM is not proposing any narrower interpretation of the clause—all of ACM's interpretations would make the negotiated endorsement a nullity. ACM also argues that Allied World's plain language reading will supposedly "strip ACM of the 'No. 1 reason' it obtained insurance from Allied World in the first place." (*Id.*) The doctrine against interpreting insurance to render its coverage illusory does not apply "where the contract terms are unambiguous," and therefore has no application here, where the Policy language is clear. *Jalbert v. XL Ins. Am., Inc.*, 2018 WL 4850403, at *11 (C.D. Cal. June 7, 2018), *adopted*, 2018 WL 4850382 (C.D. Cal. July 16, 2018). And ACM may believe that claims arising out of assertions of bad faith are "the *predominant* type of Claim envisioned under the policy," but the doctrine against illusory coverage will not apply unless Allied World's interpretation would "eliminate coverage entirely." *Jeff Tracy, Inc. v. U.S. Specialty Ins.*, 636 F. Supp. 2d 995, 1007 (C.D. Cal. 2009) (emphasis in original); *see also Ambrosio v. Certain Underwriters at Lloyd's*, 2012 WL 12540015, at *5 (N.D. Cal. Mar. 29, 2012) ("[T]o be deemed illusory, [policy] must afford *no coverage whatsoever*.") (emphasis added, internal quotation marks omitted). Indeed, the internal Allied World email that ACM cites acknowledges that the Policy covers claims that do not raise bad faith, but rather simple negligence. (ACM Ex. 29 at 287 (emphasis added).) One such potential claim is found in ACM's own documents: ███████████████████████████████████████████████████████ ." (AW Ex. 11 at 319.) ███████████████████████████ ███, ACM's actions could have given rise to negligence liability without any underlying claim for bad faith. *See also Home Ins. Co. v. Gates McDonald Co.*, No. 01-cv-7365, Dkt. 259 at 3-5 (C.D. Cal. June 21, 2004) (verdict against TPA for overpayments).

*Third*, ACM argues the claims services exclusion can *never* apply to it, citing the last sentence in the paragraph following the exclusion. (Opp. 21.) That sentence sets out a rule for reimbursement of defense costs—it does not appear in the exclusion itself, and its absence confirms there is no requirement that a particular entity perform the bad faith conduct that gives rise to the claim. *See Levi Strauss & Co. v. Aetna Cas. & Sur. Co.*, 237 Cal. Rptr. 473, 477 (Ct. App. 1986) (court should "not [] insert what has been omitted.").

*Fourth*, ACM argues that the claims services exclusion requires an "admission, final adjudication or a finding," which supposedly has not been satisfied. (Opp. 22-23.) The Policy, however, uses the optional word "may," which ACM claims is used to convey that "there are multiple ways the applicability of the bad-faith exclusion '**may**' be determined." (*Id.* at 33.) The Policy already accomplishes this goal by using the word "or" to make clear that Allied World may rely on "an admission, final adjudication *or* a finding in the proceeding constituting the Claim *or* in a proceeding separate from or collateral to the Claim." (AW Ex. 1 at 654 (emphases added).)[1] Furthermore, the Panel did find that QBE's liability arose out of bad faith and a court has held that allegations of bad faith underlie this claim. (Mem. at 16.) ACM argues this finding does not count because it was a discovery ruling and assumed facts from the parties' pleadings. (Opp. 23.) Neither point matters because the Policy states that "*alleged*" bad faith will trigger the exclusion. (AW Ex. 1 at 654 (emphasis added).) *Greenwich Ins. Co. v. Medical Mutual Insurance Co.*, 88 F. Supp. 3d 512 (E.D.N.C. 2015), *aff'd*, 667 F. App'x 385 (4th Cir. 2016), concluded that "*alleged* [] lack of good faith or unfair dealing" would trigger an almost identical exclusion, "even if the trier of fact in the [underlying] action finds that all of [the] relevant conduct occurred in good faith and with no unfair dealing." *Id.* at 516.

ACM's argument fails for a final reason: ACM's own witnesses have admitted that ████████████████████████████████████. (Mem. 4-6.) This Court can

---

[1] ACM cites internal questions and handwritten notes of Allied World employees; but none of these vague statements was made to ACM. (Opp. 23.)

thus find that ACM's claim is based upon allegations of bad faith.

### B. ACM Has No Response To The Dishonest Act Exclusion

ACM asserts that Allied World has identified "no admission, finding, or adjudication of fraud or dishonest conduct." (Opp. 24.) The arbitration panel found that "ACM has repeatedly tried to *conceal* and *misrepresent* the fact of timely receipt of the letter demand from the Cardonas." (AW Ex. 2 at 613 (emphases added).) If findings of concealment and misrepresentation do not establish "dishonest conduct," then those words have lost all meaning. ACM tries to relitigate its dishonesty, but it does not matter whether ACM disagrees with the findings—if a finding is made, the exclusion is triggered. *See Greenwich Ins. Co. v. Media Breakaway, LLC*, 2009 WL 2231678, at *10 (C.D. Cal. July 22, 2009) (ordering reimbursement where arbitrator's finding triggered fraud exclusion, although policyholder contested the facts), *aff'd*, 417 F. App'x 642 (9th Cir. 2011).

ACM argues that "Allied World fails to demonstrate that any fraud or dishonest act 'brought about or contributed to' QBE's claim." (Opp. 24.) The Court does not need to speculate whether ACM's dishonesty "contributed to" the loss (what the Policy actually requires (AW Ex. 1 at 662)). The Panel found that ACM's "tactic" of disputing receipt of the letter "considerably undermined ACM's credibility in this proceeding." (AW Ex. 2 at 604 n.9.) It also found that ACM's dishonesty began early, when "ACM's lack of candor with QBE [was] stunning" and that as a result, "the information upon which QBE based its determinations on how to proceed in the face of the Cardonas' seemingly exorbitant settlement demands was inadequate and misleading." (*Id.* at 605.)

### C. The Contract Exclusion Bars Coverage

This Court has already held that the contract exclusion bars coverage. (Mem. 17.) This holding means that the burden is on ACM to show that the exception to this exclusion applies. (Dkt. 50 at 9.) ACM cannot carry its burden as ███████████ ███████████. (Mem. 17.) In response, ACM argues without any basis that ACM's refusal to acknowledge any negligence should be ignored. (Opp. 25 n.21.)

### D. ACM Concedes That Allied World Is Entitled To Reimbursement

As ACM's claim is excluded, Allied World is entitled to reimbursement of its payment under a reservation of rights, including the $4.3 million ACM admits Allied World paid. (Mem. 18; Dkt. 25, ¶ 137.) ACM does not even respond to this argument.

## III. ACM'S BAD FAITH CLAIM FAILS ON THE LAW AND THE FACTS

ACM asserts Allied World has "lead the Court astray by claiming that ACM's bad-faith claim is 'largely predicated' on the 'failure to accept reasonable settlement demands.'" (Opp. 1.) But it is axiomatic that a bad faith claim requires the policyholder to prove that "benefits due under the policy [] have been withheld." *Harper Constr. Co., Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, 377 F. Supp. 3d 1134, 1153 (S.D. Cal. 2019); *see also* Opp. 15. The only benefits ACM asserts were withheld are settlement and defense (which ACM conflates with a duty to settle). None of ACM's cases (Opp. 14-15) applies the vague test ACM advocates. Every one of them analyzed settlement demands under well-trod California law—the same approach this Court should take.

### A. There Was Never A Substantial Likelihood Of An Excess Judgment

ACM admits that the duty to settle applies "'whenever there is a *substantial likelihood* of a recovery in excess of [the] limits.'" (Opp. 14-15 (emphasis added, citation omitted); Mem. 19-20.) ACM does not try to meet this standard, arguing instead that its own defense counsel "recogniz[ed] a *possible* verdict of ▮▮▮▮▮▮▮▮." (Opp. 19 (emphasis added).) A policyholder claiming bad faith must prove more than the mere possibility of an above-the-limits recovery. *See Pureco v. Allstate Indem. Co.*, 2018 WL 7143624, at *8 (C.D. Cal. Nov. 27, 2018) (granting summary judgment because even though the underlying injury was "serious," the facts did not establish a "substantial likelihood" of limits damages). Allied World was entitled to rely on the opinions of the numerous lawyers working on this claim, none of whom predicted that an above-the-limits award was substantially likely. *See Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. Markel Ins. Co.*, 2018 WL 5095267, at *2 (C.D. Cal. Sept. 27, 2018) (insurer can rely on defense counsel opinions, even if they end up being wrong). ACM tries to distinguish *Markel* by asserting

the underlying verdict was outside the realm of possibility. (Opp. 19.) The same is true of the verdict awarded to Cortes, ███████████████████ (AW Ex. 86 at 190:19-191:7), and the arbitration, which awarded millions more damages to QBE than the $16 million Erigero cited as the maximum possible result (AW Ex. 50 at 041).

ACM also argues that all of the contemporaneous evidence can be disregarded because the Cardonas and QBE obtained awards "significantly exceeding counsel's estimates." (Opp. 18.) But California courts have long stated that "[w]e do not believe the test of bad faith should be determined by hindsight." *Hodges v. Standard Acc. Ins. Co.*, 18 Cal. Rptr. 17, 23-24 (Ct. App. 1961). The non-precedential opinion ACM cites relies on a misunderstanding of *Crisci v. Security Insurance Co. of New Haven, Conn.*, 426 P.2d 173 (Cal. 1967), where the underlying plaintiff won $101,000, but the insurer had been warned that if a particular fact were established, a verdict of "not less than $100,000 would be returned." 426 P.2d at 175-76. In other words, the verdict in *Crisci* conformed to the pre-verdict prediction of counsel—the opposite of what happened in this case.

### B. Allied World Acted Reasonably With All Three Settlement Demands

As ACM's own cases recognize, "an insurer negotiates in bad faith when it *refuses* settlement offers that are both within policy limits and reasonable." *Highlands Ins. Co. v. Cont'l Cas. Co.*, 64 F.3d 514, 517 (9th Cir. 1995) (emphasis added) (cited by Opp. 15.) The record establishes that Allied World did not refuse any such offers.

*First*, with respect to the § 998 offers, California law is clear that a reasonable demand must offer a "'complete release against [the] insured.'" (Mem. 21.) ACM points to dictum in *Blakenbaker v. Progressive Casualty Insurance Co.*, 2012 WL 12507762 (C.D. Cal. Dec. 17, 2012), where the court considered hypothetical circumstances where "it might not be in the insured's interest to hold out for a global settlement." *Id.* at *8. But here, accepting two of the three § 998 offers would have exhausted the Policy limits and exposed ACM to further liability from the third Cardona *plus* from QBE, which was

demanding full indemnification.[2] (*E.g.*, AW Ex. 23.) Allied World's view that the § 998 offers were unreasonable was universally held, including by ACM, which instructed Jampol to "'make it very clear to QBE that we will not be reimbursing them for any settlement they enter into without our consent/participation.'" (Mem. 6-7.)

*Second*, with respect to the June 2016 demand, ACM does not dispute that this demand was made during a mediation, meaning that it cannot form the basis of a bad faith claim as a matter of law. (Mem. 22-23.) Even if ACM could rely on this demand, ACM's coverage counsel responded to the demand by asking Allied World and Chubb to consent to a side-letter to let QBE and ACM arbitrate—an agreement she said was "in the best interests of ACM, as well as its insurers." (Mem. 7-8; AW Ex. 45 at 237.) All of this was communicated to Allied World. (AW Ex. 83 at 030-31; AW Ex. 84 at 408.) But it is no surprise that this demand was not reflected in Allied World's internal claim notes—ACM made immediately clear that it did not want to entertain this demand.

*Third*, ACM misrepresents the facts concerning QBE's pre-arbitration demand. The record establishes that on April 12, 2017, ACM, Chubb, and Allied World all agreed to target a settlement of up to $8 million, and to make an opening offer of $2.5 million. (Mem. 8-9; AW Ex. 63 at 594.) ACM confirmed in writing that it "consent[ed] to the initial offer of $2.5 million by Allied World to QBE … and appreciate[d] Allied World's willingness to engage in the settlement negotiation process." (AW Ex. 55 at 166.) ACM now tries to invent uncertainty with a new declaration of Robert Bowling, who admittedly "do[es] not have a specific recollection of exactly what occurred during [the] call" on April 12, 2017. (Dkt. 110-11, ¶ 7.) Bowling's hypothetical beliefs about what he may have said or may have done cannot contradict the sworn testimony and documents describing the parties' agreement during the April 12 call. *Richards v. Neilsen Freight Lines*, 810 F.2d 898, 902 (9th Cir. 1987) ("It is the record made on summary judgment that

---

[2] Indeed, ACM could have sued Allied World if it had settled a portion of the § 998 offers over ACM's objection. (*See* AW Ex. 89 at 44:6-46:23.)

controls, not that record plus speculative inferences a trier of fact might add.").

ACM also asserts that Allied World "failed to respond to QBE's invitation [during the arbitration] for an offer above $10 million." (Opp. 17.) QBE made no offer to settle, and California law "requires proof the third party made a reasonable offer to settle the claims against the insured for an amount within the policy limits." *Graciano v. Mercury Gen. Corp.*, 179 Cal. Rptr. 3d 717, 727 (Ct. App. 2014); Mem. at 22. ACM tries to distinguish *Graciano* by arguing that the insurer there offered its policy limits, "but was 'rebuffed.'" (Opp. 17 n.15.) But even if this fact were relevant, Allied World had already been "rebuffed" because QBE made clear that it would "not respond to any offer below $10M"—double Allied World's limits. (AW Ex. 59 at 236.) Any response would therefore require Chubb's participation, and its counsel testified that Chubb was "not going to effectively negotiate against ourselves" and regardless, Chubb assessed that "any amount north of $10 million was not a reasonable settlement." (Dkt. 99-10 at 122.)

### C. None Of ACM's Other Mischaracterizations Salvage Its Claim

ACM argues that Allied World failed to investigate, but admits that California law asks only that the insurer "'keep abreast of the progress and status of the litigation in order that it may act intelligently and in good faith on settlement offers.'" (Opp. 16 (quoting *Travelers Ins. Co. v. Lesher*, 231 Cal. Rptr. 791, 801 (Ct. App. 1986)).) ACM's Schraner conceded that "Allied World … continues to actively monitor and be involved in this case." (ACM Ex. 9 at 145.)[3] While ACM asserts Allied World was not monitoring the litigation between the Cardonas and Cortes, ACM has admitted that ███████ ███████████████████████████████████████████. (AW Ex. 69 at 133:2-134:12.)

ACM also argues that "Allied World failed to tell ACM that it made its policy limits

---

[3] ACM argues that Allied World's failure to investigate is highlighted by an internal form that is used simply to memorialize the fact that Allied World was posting its reserves. (Opp. 10-11; AW Ex. 88 at 70:1-10.) Reserves are irrelevant to whether Allied World failed to settle in bad faith. *See Beltran v. Allstate Ins. Co.*, 2001 WL 741806, at *4 (S.D. Cal. June 25, 2001) ("[A]rgument that Allstate was somehow admitting liability merely by setting $10,000 aside to settle the claim is legally unsupported.").

available before the arbitration hearing, eliminating ACM's ability to demand that Chubb resolve QBE's claim before the Award." (Opp. 17.) ACM along with Allied World had agreed to target a settlement that exceeded its limits. (Mem. 9.) In fact, ACM *was* already demanding that Chubb resolve the claim. On April 14, 2017, ACM's coverage counsel wrote to Chubb's coverage counsel with a "formal demand for the policy limits of each excess policy," given that "the current demand from QBE is in excess of $15 million, and therefore encompasses the two excess policies." (AW Ex. 56.)

Finally, ACM claims (without any supporting authority) that Allied World did not send a senior-enough lawyer to sit in on the arbitration. (Opp. 18.) Allied World (through its counsel Kim Ashmore) *was* having settlement talks with QBE's insurer during the arbitration hearing. (Mem. 9-10.) Ashmore also warned against ACM's continuing to dispute that it received the Cardonas' policy-limits demand, a warning that ACM rejected that lead to the Panel's finding that ACM was dishonest. (*Id.* at 13.)

### IV. ACM'S FAILURE TO DEFEND CLAIM WOULD INVENT NEW LAW

████████████████████████████████████████████████████████. (Mem. 10-11.) ████████████████████████████████████████████████████████
████████████████████████████████████████████████████████. (AW Ex. 89 at 17:1-25:23, 30:1-5, 124:1-13.)[4] All but conceding this point, ACM advocates a new standard under which any counsel appointed to defend a third-party claim will be incompetent as a matter of law unless he (1) has experience with the type of underlying first-party dispute **and** (2) has experience litigating against the first-party plaintiff's counsel. ACM cites no law to support this standard, which would expose countless attorneys to claims of incompetence, including many of the lawyers appearing in this case.[5] The undisputed facts are that Jampol had experience litigating and winning

---

[4] Allied World did not "effectively admit[] Jampol's incompetence." (Opp. 20.) It assisted ACM to settle claims based on Jampol's *post-appointment* actions, which is ACM's real remedy. *See Dorroh v. Deerbrook Ins. Co.*, 223 F. Supp. 3d 1081, 1096 (E.D. Cal. 2016).

[5] Notably, this standard dramatically conflicts with the requirements for *Cumis* counsel such as Erigero, the lawyer who replaced Jampol. *See* Cal. Civ. Code § 2860(c).

bad faith claims, which was the claim QBE asserted against ACM. (Mem. 10-11.)

ACM claims Allied World "controlled and directed" Jampol. (Opp. 20.) Yet ACM's witness admitted: "███████████████████████████████████████ ████████████████████████████." (AW Ex. 75 at 107:19-108:9.) Jampol repeatedly testified that Allied World "never gave me an instruction that I recall, not once," and "instructions all came from [ACM's] Schraner." (AW Ex. 87 at 300:25-301:24.)[6] ACM cites the fact that Jampol's firm was appointed to represent other Allied World policyholders. (Opp. 20.) But (1) Jampol confirmed his client was always ACM, (2) ████████████████████████████████████████████████████████████████, and (3) ████████████████████████████████████████████████████████████████ ███████████████████████████████████████████.[7] (Mem. 24-25.)

## V. ALLIED WORLD SATISFIED ITS DUTY TO INDEMNIFY

ACM has identified just one portion of the Policy it asserts Allied World breached—the obligation to pay covered claims. (Opp. 21.) The Policy makes clear that the duty to indemnify only attaches once ACM is "legally obligated to pay" (AW Ex. 1 at 651), and "[u]ntil an arbitration award is confirmed by court judgment, it has only the effect of a contract between the parties." 6 Witkin, Cal. Proc. 5th § 566. ███████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████. (AW Ex. 85.) Once the award was confirmed, Allied World promptly paid, under its reservation of rights.

## VI. CONCLUSION

Allied World respectfully requests that summary judgment be granted.

---

[6] Recommending a lawyer who recommended a different lawyer who visited Cortes in prison also does not show Allied World's control. (Opp. 20; ACM Ex. 72 at 801-02.)

[7] ACM cites hearsay of Marc Zimet (Opp. 20), but Jampol stated in that same email chain that "████████████████████████████████████████████████████████████." (ACM Ex. 51 at 523 (emphasis added).)

N/A

| | |
|---|---|
| DATED: December 12, 2019 | QUINN EMANUEL URQUHART & SULLIVAN, LLP |
| | By s/ Amar Thakur |
| | amarthakur@quinnemanuel.com |
| | Attorney for Defendant and Counterclaimant Allied World Surplus Lines Insurance Company |