COOLEY LLP
William V. O'Connor (216650)
(woconnor@cooley.com)
Alexander R. Miller (294474)
(amiller@cooley.com)
4401 Eastgate Mall
San Diego, CA  92121
Telephone: (858) 550-6000
Facsimile: (858) 550-6420

Gregory Hoffnagle (*pro hac vice*)
(ghoffnagle@cooley.com)
55 Hudson Yards
New York, NY 10001
Telephone: (212) 479-6648
Facsimile: (212) 479-6275

Dane R. Voris (281051)
(dvoris@cooley.com)
500 Boylston Street
Boston, MA 02116
Telephone: (617) 937-2300
Facsimile: (617) 937-2400

Attorneys for Plaintiff and Counterclaim-
Defendant AMERICAN CLAIMS
MANAGEMENT, INC.

BROWN & BROWN, INC.
Mark E. King (*pro hac vice*)
Chief Litigation Counsel
(MEKing@bbins.com)
220 South Ridgewood Avenue
Daytona Beach, FL 32115
Telephone: (386) 239-5782
Facsimile: (386) 239-5729

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

AMERICAN CLAIMS
MANAGEMENT, INC.,

        Plaintiff and
        Counterclaim-
        Defendant,

    v.

ALLIED WORLD SURPLUS LINES
INSURANCE COMPANY (f/k/a/
Darwin Select Insurance Company)

        Defendant and
        Counterclaimant.

Case No.  3:18-cv-00925-JLS-MSB

**ACM'S OPPOSITION TO ALLIED
WORLD'S MOTION FOR SUMMARY
JUDGMENT**

Date:  December 19, 2019
Time:  1:30 p.m.
Judge:  Hon. Janis L. Sammartino
Courtroom:  4D

**UNDER SEAL**

**Table of Contents**

**Page**

I.   INTRODUCTION ................................................................................................ 1

II.  BACKGROUND ................................................................................................. 2

    A.   ACM Obtains $15 Million in Professional Liability Coverage ...................... 2

    B.   QBE Notifies ACM of a Professional Liability Claim. ................................. 3

    C.   Allied World Appoints and Controls Incompetent "Defense" Counsel ................................................................................................... 4

    D.   QBE Initiates Arbitration Proceedings Against ACM. ................................. 8

    E.   ACM's Exposure Only Grows as the Arbitration Hearing Nears .............. 10

    F.   Allied World Realizes It Has a Huge Problem on Its Hands. .................... 10

    G.   Allied World Lets Yet Another Settlement Opportunity Pass. ................... 12

    H.   QBE Recovers More Than $18 Million Against ACM. ............................... 13

    I.   Allied World Refuses to Cover ACM, Prompting this Litigation ............... 14

III. ARGUMENT .................................................................................................... 14

    A.   Allied World Tortiously Breached the Implied Covenant by Repeatedly Depriving ACM of Policy Benefits in Bad Faith ...................... 14

    B.   Allied World Breached its Duty to Defend by Unilaterally Appointing and Controlling Incompetent Counsel. ..................................... 19

    C.   Allied World Breached its Duty to Indemnify At Least by Failing to Timely Cover ACM's Losses ................................................................... 21

    D.   ACM's Coverage is Not Excluded ............................................................ 21

        1.   Endorsement No. 9 is Inapplicable .................................................. 21

        2.   The Fraud Exclusion is Inapplicable ................................................ 24

        3.   The Contract Exclusion is Inapplicable. .......................................... 25

IV.  CONCLUSION ................................................................................................ 25

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Table of Authorities**

**Page(s)**

**Cases**

*Allen v. Allstate Ins. Co.*,
656 F.2d 487 (9th Cir. 1981) .................................................................... 14, 16

*Aspen Specialty Ins. Co. v. Willis Allen Real Estate*,
2015 WL 3765008 (S.D. Cal. June 15, 2015) ................................................. 15

*Blakenbaker v. Progressive Cas. Ins. Co.*,
2012 WL 12507762 (C.D. Cal. Dec. 17, 2012) ............................................... 16

*Carr Bus. Enters., Inc. v. City of Chowchilla*,
166 Cal. App. 4th 14 (2008) ......................................................................... 25

*Church Mut. Ins. Co. v. U.S. Liab. Ins. Co.*,
347 F. Supp. 2d 880 (S.D. Cal. 2004) ............................................................ 22

*Commercial Union Assurance Cos. v. Safeway Stores, Inc.*,
26 Cal. 3d 912 (1980) ................................................................................... 15

*Comunale v. Traders & Gen. Ins. Co.*,
50 Cal. 2d 654 (1958) ................................................................................... 20

*Cont'l Cas. Co. v. Royal Ins. Co.*,
219 Cal. App. 3d 111 (1990) ......................................................................... 17

*DeFrenza v. Progressive Express Ins. Co.*,
345 F. Supp. 3d 1243 (E.D. Cal. 2017) .......................................................... 18

*Egan v. Mut. of Omaha Ins. Co.*,
24 Cal. 3d 809 (1979) ................................................................................... 21

*Fireman's Fund Ins. Co. v. Haslam*,
29 Cal. App. 4th 1347 (1994) ......................................................................... 2

*Graciano v. Mercury General Corp.*,
231 Cal. App. 4th 414 (2014) ........................................................................ 17

*Gray v. Zurich Ins. Co.*,
65 Cal. 2d 263 (1966) ................................................................................... 22

**Table of Authorities**
(continued)

Page

*Greenwich Ins. Co. v. Med. Mut. Ins. Co. of N.C.,*
   88 F. Supp. 3d 512 (E.D.N.C. 2015) ................................................................. 21

*Highlands Ins. Co. v. Cont'l Cas. Co.,*
   64 F.3d 514 (9th Cir. 1995) ............................................................................... 15

*Howard v. Am. Nat'l Fire Ins. Co.,*
   187 Cal. App. 4th 498 (2010) ...................................................................... 15, 18

*in Buss v. Sup. Ct.,*
   16 Cal. 4th 35 (1997) ........................................................................................ 16

*Martin v. Hartford Accident & Indem. Co.,*
   228 Cal. App. 2d 178 (1964) ............................................................................. 17

*Mattson v. United Servs. Auto. Ass'n,*
   2019 WL 2330087 (S.D. Cal. May 31, 2019)................................................... 18

*McDaniel v. Gov't Employees Ins. Co.,*
   681 F. App'x 614 (9th Cir. 2017)...................................................................... 23

*Merritt v. Reserve Ins. Co.,*
   34 Cal. App. 3d 858 (1973) .............................................................................. 20

*Miller v. Elite Ins.,*
   100 Cal. App. 3d 739 (1980) ............................................................................ 22

*Nat'l Union Fire Ins. Co. v. Markel Ins. Co.,*
   2018 WL 5095267 (C.D. Cal. Sept. 27, 2018).................................................. 19

*PPG Indus., Inc. v. Transamerica Ins. Co.,*
   20 Cal. 4th 310 (1999) ...................................................................................... 15

*Reid v. Mercury Ins. Co.,*
   220 Cal. App. 4th 262 (2013) ........................................................................... 15

*Reno v. Nat. Union Fire Ins. Co. of Pittsburg,*
   2016 WL 4597524 (S.D. Cal. Mar. 25, 2016) .................................................. 21

*Shade Foods, Inc. v. Innovative Prods. Sales & Mktg., Inc.,*
   78 Cal. App. 4th 847 (2000) ............................................................................. 16

**Table of Authorities**
**(continued)**

**Page**

*Travelers Ins. Co. v. Lesher,*
    187 Cal. App. 3d 169 (1986) ................................................................................. 16, 20

*Ventura Kester, LLC v. Folksamerica Reins. Co.,*
    219 Cal. App. 4th 633 (2013) ........................................................................................ 23

*Walbrook Ins. Co. v. Liberty Mut. Ins. Co.,*
    5 Cal. App. 4th 1445 (1992) .......................................................................................... 15

**Statutes**

Cal. Civ. Proc. Code
    § 998 ....................................................................................................................*passim*
    § 1858 ............................................................................................................................ 23

Cal. Code Regs. tit. 10
    § 2695.7(b) ...................................................................................................................... 4
    § 2695.7(g) .................................................................................................................... 18

S.D. Cal. Civ. L. R. 5.1(e) .................................................................................................. 2

**Other Authorities**

Fed. R. Civ. P. 56(a) ........................................................................................................... 2

## I.   INTRODUCTION

ACM is a third-party claims handler that provides its professional services on behalf of insurer clients. In 2010, ACM purchased a professional liability policy ("Policy") from Allied World (aka "AWAC") to protect itself if it negligently handled a claim. A year later, one of ACM's clients, QBE, alleged just that, and ACM tendered the matter to Allied World. Instead of defending ACM as it was obligated to, Allied World appointed and controlled incompetent counsel, refused to act on multiple settlement opportunities, and all but abandoned ACM at an arbitration that resulted in an $18-million award against ACM. Now, seven years after the genesis of this dispute and after making a partial payment of millions of dollars to ACM, Allied World claims ACM never had coverage at all and that no disputes of material fact exist in this case. Allied World's motion fails on all levels.

*First*, Allied World engaged in a years-long course of bad-faith conduct, depriving ACM of nearly every Policy benefit it bargained for. Instead of owning up to its misconduct, Allied World tries (again) to lead the Court astray by claiming that ACM's bad-faith claim is "largely predicated" on the "failure to accept reasonable settlement demands" and, worse, by pointing the finger at everyone but itself, including ACM. To be clear, neither ACM's claim nor the bad-faith doctrine is limited to accepting settlement demands. And this Court should not allow Allied World to shirk its obligations so easily.

*Second*, Allied World breached its duty to defend by unilaterally appointing "defense" counsel, Alan Jampol, who lacked the key credentials an insured would reasonably expect. Jampol's incompetence only multiplied ACM's exposure, and Allied World's control and direction of Jampol renders it responsible for his negligence.

*Third*, Allied World breached its duty to indemnify at least by refusing to pay its policy limits for months after QBE's award, leaving ACM to pay accrued interest.

*Finally*, the Policy does not exclude ACM's coverage: QBE's claim was precisely the type of professional-services liability that ACM and Allied World expected the Policy to cover. Allied World knows its exclusions have no applicability here, which is why it purported to provide ACM a "defense" for years before effectively cutting ACM loose.

1    As demonstrated below, this case is replete with disputed issues of material fact.

2    Fed. R. Civ. P. 56(a). The Court should deny Allied World's motion in its entirety.

3    **II.    BACKGROUND**

4       **A.    ACM Obtains $15 Million in Professional Liability Coverage.**

5       ACM is a third-party administrator ("TPA") that handles insurance claims under

6    contracts with insurer clients. (Ex 75 at 820; Ex 76 at 831–32.) ACM's principal source of

7    legal exposure is from bad-faith actions brought against its clients if ACM mishandles a

8    claim, including settlement demands. (Ex 61 at 646–47.) An insurer who fails to accept a

9    settlement demand within policy limits on behalf of its insured may be exposed to liability

10   beyond those limits for breach of the implied covenant of good faith and fair dealing—*i.e.*,

11   "bad faith" or "extra-contractual" liability. While ACM cannot be liable to an insured for

12   bad faith under California law, an insurer can recover its extra-contractual damages from

13   its agent TPA. *See Fireman's Fund Ins. Co. v. Haslam*, 29 Cal. App. 4th 1347, 1354 (1994)

14   (agent is liable to insurer for negligence). This the "No. 1 reason" ACM purchases

15   professional liability insurance. (Ex 61 at 646–47.)

16      In 2010, ACM obtained the Policy from Allied World, which insured ACM for $5

17   million in "**Loss** and **Defense Expenses**" for Claims made between October 1, 2010 and

18   October 1, 2011 for a "**Professional Services Wrongful Act**." (Ex 1[1] at 11.)[2] Professional

19   Services Wrongful Acts include any "[n]egligent act, error, omission, misstatement,

20   misleading statement, neglect or breach of duty" by ACM in the "performance of or failure

21   to perform **Professional Services**." (*Id.* at 23–24.) Professional Services means services

22   performed "in the usual and customary conduct of [a TPA]." (*Id.* at 23; *see* Ex 10 at 151.)

23      The Policy requires Allied World to defend ACM against any "**Claim** for a

24   Professional Services Wrongful Act"—"covered in whole or in part"—even if "groundless,

---

26   [1] "Ex" citations are to Exhibits to the accompanying Declaration of Dane Voris, which are

27   consecutively paginated. S.D. Cal. Civ. L. R. 5.1(e).

28   [2] A "Claim" includes "any written demand for monetary, non-monetary, or injunctive relief," including "any arbitration proceeding." (Ex 1 at 20–21.)

1  false or fraudulent." (Ex 1 at 11.) Included in this duty to defend is the duty to negotiate

2  and settle Claims against ACM. (Ex 62 at 653–54.) The Policy gives Allied World the

3  absolute right to negotiate and settle on behalf of ACM as Allied World "deems

4  appropriate." (Ex 1 at 29.) Allied World may request that ACM "assist in making

5  settlements," but ACM has no right to settle, or even offer to settle, a Claim without Allied

6  World's express consent—a restriction Allied World repeatedly reminded ACM of over

7  the years. (*Id.*; Ex 13 at 173; Ex 16 at 196.)

8        ACM also purchased excess liability policies from Westchester Surplus Lines

9  Insurance Company and Federal Insurance Company (collectively, "Chubb"), each

10  providing an additional $5 million of coverage. (Ex 2; Ex 3.) The excess policies

11  incorporate the terms of the Policy, but provide ACM with coverage only after each

12  underlying policy's limits are fully paid on behalf of ACM—*i.e.*, exhausted. (Ex 2 at 39; Ex

13  3 at 51.) ACM thus purchased a total of $15 million in professional liability coverage.

14        **B.    QBE Notifies ACM of a Professional Liability Claim.**

15        In 2011, ACM handled auto claims in California for QBE Insurance Corporation

16  ("QBE") pursuant to a Claims Management Agreement ("CMA"). (Ex 4; Ex 7 at 137.)

17  ACM had the authority to manage and settle claims made against QBE's insureds

18  "according to generally accepted procedures normally followed in the insurance claims

19  business and specifically according to the operations and procedures of ACM." (Ex 4 at

20  67.) ACM was required to "diligently manage and pursue the prompt, fair, and just

21  settlement or defense of all Claims in [QBE's] best interest" and "[e]xercise reasonable care

22  at all times in the performance of its duties hereunder"—thus memorializing ACM's

23  common-law duty as QBE's agent to exercise reasonable care, diligence, and skill in its

24  work. (*Id.* at 67, 69; Ex 55 at 614; *see also* ECF No. 72 at 11–12.) Consistent with this duty,

25  ACM also agreed to indemnify QBE for any claims "arising out of or in connection with

26  any negligence or deficiency of performance" by ACM. (Ex 4 at 78.)

27        In September 2011, QBE notified ACM of a potential claim based on ACM's alleged

28  mishandling of a third-party auto claim arising from an accident caused by QBE's insured,

Galdino Cortes. (Ex 40 at 401.) Cortes, who was intoxicated and later imprisoned for driving under the influence, crashed into a car occupied by Jose, Irene, and Eduardo Cardona. (Ex 7 at 137; Ex 57 at 621–27.) The Cardonas mailed a policy-limits demand to ACM on February 23, 2011, requiring a response by March 10, 2011. (Ex 7 at 138; Ex 57 at 620.) ACM did not respond by the Cardonas' deadline, and did not offer Cortes' $30,000 QBE policy limits to the Cardonas until March 29, 2011.[3] (Ex 7 at 138.) The Cardonas rejected the offer and instead asserted that the cap was now off Cortes' QBE policy. (*Id.*) As a result, QBE claimed that ACM negligently handled the Cardona demand and "created potential exposure to QBE of extra-contractual liability." (Ex 40 at 401.) ACM notified Allied World of QBE's allegations, and Allied World assigned the matter to an adjuster named Brett Arruda. (*Id.* at 395–96; Ex 67 at 725–26, 731.)

### C. Allied World Appoints and Controls Incompetent "Defense" Counsel.

In November 2012, the Cardonas sued Cortes. (Ex 7 at 138.) Though Allied World previously declined to appoint counsel for ACM, that changed in 2014 when Arruda unilaterally hired Jampol Zimet LLP. (Ex 13 at 173; Ex 47 at 480; Ex 72 at 785–86; Ex 67 at 732.) Marc Zimet, who accepted the engagement, quickly "turn[ed] over the reins" to his partner, Alan Jampol. (Ex 34 at 328.)

Jampol's firm received an extraordinary amount of work from Allied World, including at least 63 matters between 2007 and 2017 alone.[4] (ECF No. 35-2, ¶¶ 9–10.) Arruda, however, had never worked with Jampol. (Ex 62 at 661; *but see* Mot. at 10.) Even so, Arruda did zero diligence on Jampol's qualifications before letting him take over ACM's defense. (Ex 62 at 661–63; Ex 72 at 791–92.) In fact, Jampol had handled (maybe) five to ten bad-faith insurance cases in his entire career, none of which involved an auto policy like that at issue in the QBE matter. (*Id.* at 789–90.) Jampol had **no** experience with

---

[3] As Allied World recognizes, under California law, ACM had 40 days to respond to the Cardonas' demand. (ECF No. 99-1 ("Mot.") 4); Cal. Code. Regs. tit. 10 § 2695.7(b).

[4] Allied World has not disclosed Jampol's compensation from this work, and thus the depth of his allegiance to Allied World. (*See* ECF No. 41-1.) ACM's objection to Judge Berg's conclusion that such information is "irrelevant" is pending. (*Id.*)

"automobile accident cases" at all. (*Id.* at 796.) Nor had Jampol ever handled a bad-faith case involving the firm representing the Cardonas, which had a reputation for setting up insurance bad-faith claims involving car accidents. (*Id.* at 790; Ex 68 at 739–40; Ex 75 at 823.) Jampol, in other words, had none of qualifications an insured like ACM would expect from appointed counsel, yet Allied World turned a blind eye.[5] (Ex 62 at 663.) Subsequent events only confirmed Jampol's incompetence.

*First*, within weeks of being appointed, Jampol concocted an assignment scheme to eliminate QBE's (and therefore Allied World's) extra-contractual exposure for failing to timely accept the Cardona demand—a scheme that Judge Rogers of the California Superior Court later deemed *prima facie* fraud. (*See* Ex 39; Ex 58 at 634.) If Jampol could convince Cortes, QBE's insured, to assign his potential bad-faith claim ***against*** QBE ***to*** QBE itself (and not to the Cardonas), the Cardonas' only recourse would be against Cortes, who was in prison and presumably had few assets. (Ex 39 at 392; Ex 49 at 500–01.) Jampol had never obtained an assignment like this before, much less from an "unsophisticated" insured in prison, yet he could see no reason why his "ingenious" idea would not work. (Ex 39 at 371; Ex 49 at 498, 500–01; Ex 72 at 799–00.) The assignment was "a clear violation of the customs and practices of the insurance industry." (Ex 55 at 611–12.)

Robert Schraner, then General Counsel of ACM's parent company, was understandably skeptical of Jampol's scheme and repeatedly expressed his concern that it could expose QBE to further bad-faith liability from Cortes. (Ex 76 at 843–44.) But Schraner looked to Allied World to be proactive in defending and resolving QBE's claim, and "neither QBE nor Allied [World] were willing" to settle the case with the Cardonas. (*Id.* at 840, 845.) Indeed, if ACM refused to go along with the assignment, Allied World could argue that ACM breached its obligation to cooperate under the Policy. (Ex 76 at 848–49; Ex 1 at 29.) Schraner ultimately agreed to the assignment on the condition that QBE and Allied World approve it too. (Ex 76 at 841–44.)

---

[5] Jampol's purported specialty in "legal malpractice law" is irrelevant. (Mot. 11.)

Jampol, it turns out, could do nothing without Allied World's permission. (Ex 703 at 807; Ex 72 at 787.) Fortunately for Jampol, Arruda was "very enthusiastic" about the assignment and "thought it was a great idea." (Ex 72 at 788.) Arruda not only "authorized" and "encouraged" the assignment, he directed Jampol to retain a bilingual lawyer to present the assignment to Cortes in prison in Spanish. (Ex 73 at 808; Ex 72 at 801–02; *see also* Ex 33 at 324.) Jampol did just that, and obtained the assignment from Cortes—without Cortes' defense counsel present—in August 2014. (Ex 7 at 138.) After recognizing that he had identified the wrong insurance company in the document, however, Jampol doubled down and obtained a second assignment from Cortes. (Ex 76 at 846–47; Ex 7 at 138.)

*Second*, in January 2015—months before obtaining a $21-million verdict against Cortes—the Cardonas offered to settle for just $5.25 million under Code of Civil Procedure § 998. (Ex 45 at 450.) Cortes's QBE-appointed defense counsel, Steve Belilove, directed the offers to ACM, who forwarded them to Jampol and Arruda since Allied World had the duty to defend and settle the matter for ACM. (*Id.* at 450–52; *see* Ex 75 at 821–22.) Schraner reasonably expected that Allied World would fulfill its duty and perform "its own investigation and evaluation of the case," "independently evaluate" whether the Cardonas' offers should be accepted, and "if it deemed it appropriate[,] to offer money to settle the case." (Ex 76 at 850–53.) Yet, as Arruda's claim notes reflect, Allied World did nothing, apparently taking comfort in the fact that Jampol's assignment would cut off QBE's exposure to any claim by Cortes (or the Cardonas).[6] (Ex 48 at 488–89; Ex 62 at 664–65.)

By August 2014, months before the § 998 offers, Belilove had already recognized that the Cardonas would "undoubtedly prevail at trial" against Cortes, and estimated a potential verdict "well in excess of $1,000,000," including $1.5 to $2 million for Jose, "in the $260,000 range" for Irene, and "in the $170,000 range" for Eduardo. (Ex 50 at 519.) Still, Belilove's estimate for Jose Cardona, "the most seriously injured plaintiff," did not even consider his "claimed neurological damage," which would make his case worth

---

[6] Allied World claims it did not know of ACM's excess policies until late 2015. (Mot. 3.) In fact, ACM provided Arruda's contact information to Chubb in 2014. (Ex 9 at 145.)

1    "substantially more." (*Id.* at 515, 519.) Nor did Belilove account for Jose Cardona's "future

2    medical treatment," which would "almost certainly" be sought at trial. (*Id.* at 519.)

3          Belilove's estimates were not only subject to serious caveats, they were wrong. (Ex

4    72 at 793–94.) Because Jampol had no experience with auto accident cases like the

5    Cortes/Cardonas matter, however, he "simply accepted" and "absolutely relied" on what

6    Belilove "had to say." (*Id.* at 795–98.) Jampol was also still confident his assignment would

7    work. (Ex 41 at 411.) But after observing the Cortes/Cardonas trial, even Jampol's

8    associate, who "had never handled a personal injury case himself," was not surprised the

9    Cardonas obtained a $21-million verdict. (Ex 72 at 794.) Jampol's lack of experience and,

10   therefore, blind reliance on Belilove's liability estimates made it impossible for him to

11   competently advise ACM on its potential exposure.

12         Belilove's August 2014 report, on which Allied World relies to suggest the § 998

13   offers were unreasonable, also fails to account for intervening events regarding the Cortes

14   assignment and Allied World's misplaced reliance on Jampol's scheme. (*See* Ex 50.) As

15   Jampol noted in a December 2014 report to Arruda, Cortes never accepted payment for

16   the assignment and his daughter hired independent counsel who demanded QBE rescind

17   the assignment or face a bad-faith lawsuit (which he later filed). (Ex 41 at 410–11; Ex 73

18   at 808–09; Ex 48 at 488.) Yet, even when QBE later reached out directly to Allied World

19   asking it to settle two of the Cardonas' claims ***within*** Allied World's policy limits, Allied

20   World neither accepted nor even attempted to negotiate QBE's demand on ACM's behalf,

21   apparently still hoping Jampol's assignment would work. (Ex 14 at 177; Ex 48 at 490.)

22         As Schraner feared, the assignment turned out to be a disaster for QBE and ACM.

23   (*See* Ex 58.) After the Cardonas obtained their $21-million judgment against Cortes, Cortes

24   challenged the assignment and sued QBE for bad faith and elder abuse. (Ex 7 at 138; Ex

25   73 at 806.) As QBE's counsel explained, Jampol's assignment created a new layer of bad-

26   faith exposure for QBE: even if ACM's initial handling of the Cardona demand were

27   defensible, Cortes now had another bad-faith claim against QBE for eliminating "Cortes's

28   opportunity to protect himself by assigning his rights to the Cardonas." (Ex 74 at 814–15.)

1    Once Judge Rogers found the assignment *prima facie* fraudulent, QBE's exposure became

2    "incredibly dangerous." (*Id.* at 815–16.) Even Allied World recognized the massive damage

3    Jampol caused, later settling claims of professional negligence with him. (Ex 77 at 857.)

4        **D.    QBE Initiates Arbitration Proceedings Against ACM.**

5        In October 2015—after the Cardonas sued QBE to invalidate the assignment, and

6    Cortes followed with his own lawsuit against QBE—QBE commenced an arbitration

7    against ACM. (Ex 7 at 138; Ex 53; Ex 54.) QBE's core allegation was that ACM's

8    ***negligence*** in handling the Cardona policy-limits demand "exposed QBE to extra-

9    contractual liability." (Ex 53 at 551–52, 554, 557; Ex 54 at 578–79; Mot. 5.)

10       Allied World retained new defense counsel for ACM from Ropers Majeski Kohn

11   Bentley, who quickly recognized the seven-figure exposure faced by ACM for its initial

12   handling of the Cardona demand and Jampol's assignment. (Ex 35 at 339; Ex 44 at 448.)

13   In a series of increasingly alarming reports in early 2016, Ropers Majeski warned (1) of the

14   ███████████████████████ in the arbitration based on unresolved ███████████

15   ███████████████████████ (*id.* at 444–45); (2) that Jampol's assignment

16   alone represented ███████████████ for ACM (*Id.* at 448); (3) that ████████

17   ████████████████████████████████████████████████████

18   ████████████████ (Ex 43 at 425); and (4) that QBE appeared to be estimating its bad-

19   faith exposure ███████████████—which Ropers Majeski did not disagree with—

20   of which an arbitration panel could require ACM to pay ███████████ (*Id.* at 426–28;

21   Ex 70 at 754–55.) Assuming QBE settled with Cortes and the Cardonas for $15 million,

22   Ropers Majeski still anticipated $7.5–10 million of liability for ACM even at this early stage

23   of the arbitration. (Ex 70 at 756.)

24       In late June 2016, QBE notified ACM that it intended to accept a Cardonas/Cortes

25   joint $15-million settlement demand. (*See* Ex 20 at 220.) QBE then made a demand to settle

26   its own claims against ACM for $15 million.[7] (Ex 17 at 201.) QBE's demand was "open

27   ――――――――――――

28   [7] QBE's demand is not privileged. (*See* Mot. 23.) ACM and QBE attended a mediation on
     June 28, 2016, but QBE's offer was outside that process. (Ex 70 at 757–58.)

ACM'S OPP'N TO MSJ
3:18-CV-00925-JLS-MSB

1  until the close of business on June 30, 2016," but in fact, remained on the table "for several

2  months." (*Id.*; Ex 70 at 762–65.) ACM forwarded QBE's demand to Allied World, who did

3  nothing. (*See id.*; *see* Declaration of Robert Bowling ("Bowling Decl.") ¶¶ 5–6.)

4     Notwithstanding ACM's combined coverage of $15 million, Allied World offered

5  no money "to even test [QBE's] demand." (Ex 70 at 759–60.) Allied World never asked

6  ACM to contribute to a settlement, nor did it attempt to negotiate with QBE. (Ex 62 at

7  669–71.) Arruda could not have settled the matter even if he wanted to: Allied World did

8  not grant him more than $500,000 of settlement authority—3% of QBE's ask—until

9  months later. (*Id.* at 666–67.) Shockingly, Arruda's claim notes make no mention of QBE's

10  June 2016 demand, and Kelly Doherty-Schaffner, Arruda's supervisor with the authority

11  to offer Allied World's full $5 million policy limits to QBE, cannot recall a single

12  conversation with Arruda about QBE's demand. (Ex 48 at 491–92; Ex 69 at 748–49.) Allied

13  World simply ignored the settlement opportunity.

14     Faced with no money from Allied World, but recognizing QBE's settlement with

15  the Cardonas/Cortes contingent was in everyone's interests, ACM agreed not to challenge

16  QBE's $15-million payment as "unreasonable" in the arbitration. (Ex 20 at 220, 224.) Kim

17  Ashmore, Allied World's newly hired coverage counsel at the time, now claims that ACM

18  "wanted to proceed to arbitration" and "did not want to entertain [QBE's] demand," but

19  Allied World fails to identify a single statement by ACM to that effect, relying instead on

20  Ashmore's self-serving "understanding."[8]  (Mot. 8; Ex 63 at 676–79).  Ashmore's

21  speculation is nonsense: As ACM made clear in the past, if ACM's insurers were willing to

22  fund a settlement, ACM would not object. (Ex 59 at 637.)

23     In reality, while QBE was trying to settle with ACM, Allied World was preoccupied

24  trying to clean up its Jampol mess. On June 29, 2016—the day after receiving QBE's $15-

25  million demand—Allied World was pushing for a tolling agreement to assert malpractice

26  claims against Jampol and directing Ropers Majeski to prepare a complaint against Jampol

27

28  [8] Ashmore was Allied World's second coverage counsel for the QBE claim. (Ex 63 at 675.)
   Allied World terminated its first, Susan Field, in May 2016. (Ex 71 at 779–80.)

1  if a tolling agreement could not be procured. (Ex 18 at 205, 207.) Not surprisingly—with

2  at least 63 matters for Allied World from 2007 to 2017 alone—Jampol acquiesced to Allied

3  World's tolling request in less than 24 hours. (Ex 19 at 209); *supra* § II.C.

4  **E.    ACM's Exposure Only Grows as the Arbitration Hearing Nears.**

5  Allied World's indifference left ACM with no opportunity to settle QBE's claim

6  early on, so QBE pushed on with the arbitration. As Ropers Majeski prepared ACM's case

7  for hearing, its estimate of ACM's likely exposure grew. (*See* Ex 42.) In February 2017,

8  ACM's defense counsel, Steve Erigero, warned it was

9  and stressed that settlement

10  was better than                                         sought by QBE. (*Id.* at 420.)

11  Allied World knew QBE would entertain settlement offers, but Erigero advised that

12  ACM's insurers would need to offer

13  (*Id.* at 421; Ex 36 at 343.) True to form, Allied World did nothing.

14  Then, on March 23, 2017, Erigero circulated a pre-arbitration report providing a

15  comprehensive overview of the case. (Ex 21.) Erigero recognized a verdict range up to $16

16  million, and "handicap[ped]" ACM's likely exposure around $12.5 million—more than

17  80% of ACM's available coverage. (*Id.* at 247; Ex 70 at 769–70.) A week later, Erigero

18  stressed that "[w]e continue to remain very concerned about [ACM's] exposure," and saw

19  "the panel assessing the majority of [QBE's] $15,000,000 settlement to ACM" along with

20  other claimed damages. (Ex 22 at 260.) Erigero "continue[d] to recommend that efforts be

21  made to resolve [QBE's claims] by settlement." (*Id.*)

22  **F.    Allied World Realizes It Has a Huge Problem on Its Hands.**

23  Days before the arbitration hearing, Allied World woke up and pivoted to self-

24  interested damage-control mode. First, Allied World recognized QBE would recover more

25  than ACM's remaining Policy limits and began the process of belatedly reserving that

26  amount for payment. (*See* Ex 23.) On April 4, 2017, Arruda prepared an Executive Claims

27  Summary ("ECS") for senior Allied World executives providing his "Damage/Injury

28  Assessment" and noting Allied World's "intent to advise ACM that we will make available

our remaining limits" for settlement. (*Id.* at 264–65; Ex 69 at 747.) But since Arruda had performed no independent investigation of QBE's claim, he simply pasted portions of Erigero's pre-arbitration report into the ECS. (Ex 61 at 648; *compare* Ex 23 at 264–65, *with* Ex 21 at 246–48.) Before passing the ECS on to Allied World executives, however, Arruda's supervisors attempted to cover their tracks by sanitizing the document of suggestions that ACM's substantial liability was likely (though it clearly was). (*Compare* Ex 23 at 264–65, *with* Ex 30 at 293; *see also* Ex 62 at 652.)

Next, contrary to what Arruda and his supervisors told Allied World executives they would do, and unbeknownst to ACM, Allied World tendered its policy limits to ***Chubb***, ***not ACM***, and then attempted to deflect responsibility for ACM's fate by "deferring" to Chubb going forward.[9] (Ex 63 at 680–82, 684–91.) Neither Allied World nor Chubb's counsel recall a single instance of a primary insurer tendering its limits to an excess insurer instead of the policyholder like Allied World did here. (Ex 67 at 733; Ex 65 at 707, 712–13.) Yet Ashmore claims that Allied World did so at ***Chubb's*** direction. (Ex 63 at 681–83, 694.) Specifically, ***Chubb*** did not want ACM to understand it "would be taking over responsibility for the case from Allied World." (Ex 56 at 618.) Not surprisingly, Chubb denies Allied World's story.[10] (Ex 65 at 710–11, 713–14.) At no point during the arbitration did ACM understand that Allied World's limits were available to settle. (Ex 66 at 718–19.)

Then, the week before the arbitration hearing, Allied World decided to make a low-ball $2.5-million settlement offer to QBE. (Ex 26 at 276.) Allied World's offer came days after QBE declined to extend any settlement demand other than "100%" of its claimed damages and warned it would only consider an offer that "reasonably represents [ACM's] exposure." (Ex 24 at 267.) Allied World's offer ignored Erigero's warning that ACM would

---

[9] Allied World's claim that an April 12, 2017 call made clear it tendered its limits to Chubb is belied by a follow-on letter from ACM's counsel continuing to request that Allied World "have the remainder of the policy limits available." (Mot. 9; Ex 46 at 472.)

[10] Allied World relies on its communications with Chubb in its motion, but still refuses to produce a complete set of such communications. (ECF No. 99-8 at 74–75.) ACM's objection to Judge Berg's order on this issue is currently pending. (ECF No. 94.)

ACM's Opp'n to MSJ
3:18-CV-00925-JLS-MSB

1    need to offer ███████████████████████████████████████████████████

2    (Ex 42 at 421; *see also* Ex 70 at 772–73.) ACM consented to Allied World's offer (Ex 25 at

3    271); as Erigero explained, "any money on the table to start the process is better than

4    nothing." (Ex 70 at 771.) As expected, QBE did not respond. (Ex 27 at 278.)

5           Finally, Allied World distanced itself from ACM's defense entirely.  First, Ashmore

6    asked Erigero to bring on another trial lawyer three days before the arbitration hearing. (Ex

7    26 at 274–75.) When no qualified lawyer with any case experience was available, Ashmore

8    persisted, proposing someone who could bring a set of "fresh eyes" to the matter. (*Id.* at

9    274.) Ashmore's condescending request went nowhere. (Ex 70 at 766–67.) Then, in an act

10   of unquestionable bad faith, Arruda and Ashmore failed even to attend the hearing, instead

11   sending a first-year associate from a new law firm with no settlement authority to attend

12   for Allied World. (Ex 62 at 668; Ex 63 at 689–90.)

13          **G.     Allied World Lets Yet Another Settlement Opportunity Pass.**

14          On April 18, 2017, the second day of the arbitration hearing, Ashmore contacted

15   counsel for QBE's insurer, AIG, to follow up on Allied World's $2.5-million offer.[11] (Ex

16   27 at 278.) As Ashmore explains it, ***Chubb*** wanted her to "take the lead" in contacting

17   AIG so as to continue keeping ACM in the dark about Allied World's tendering of limits

18   to Chubb. (Ex 63 at 692–94.) Even though ACM had already suffered, in Allied World's

19   terms, a "devastating" cross-examination, AIG signaled that QBE was still open to

20   compromise and willing to consider an offer above $10 million, which was well within

21   ACM's combined coverage. (Ex 27 at 278.) Yet, Allied World again failed in its duty to

22   defend and never made an increased offer, instead pushing the decision off on Chubb. (Ex

23   63 at 695–96.) Chubb's counsel then attempted to deflect blame to ACM, contending that

24   ACM's counsel thought its share of the fault was "not a big number" and that "any amount

25   north of $10-million was not a reasonable settlement." (Ex 65 at 708–09.) Not true: ACM

26   had every incentive for Allied World and Chubb to settle on behalf of ACM, and its counsel

27   ─────────────────────
28   [11] AIG paid the bulk of the Cortes/Cardonas settlement, and thus any ACM/QBE
     settlement would likely go to AIG. (Ex 54 at 577.)

agreed to no such thing. (Bowling Decl. ¶¶ 7–9.) Allied World dismissed QBE's overture, and the hearing concluded two days later. (*See* Ex 8 at 142.)

On May 24, 2017, Erigero circulated a post-arbitration report. (Ex 6.) Erigero acknowledged that the testimony showed ACM's handling of the Cardona demand was ██████████ and that Jampol's involvement only ██████████ ACM's problems. (*Id.* at 133–34.) Erigero expected the panel to hold ACM accountable for most if not all of QBE's $15-million+ damages.[12] (*Id.* at 134–35.) Allied World apparently agreed: weeks later, Arruda notified another supervisor, Carrie Campi, that he expected Allied World to pay its remaining limits by the end of July. (Ex 28.) Still, nobody told ACM that Allied World's limits were tendered. (Ex 66 at 718–19.)

## H.   QBE Recovers More Than $18 Million Against ACM.

On July 24, 2017, the arbitration panel awarded QBE more than $18 million ("Award"), not because ACM acted in bad faith, but because ACM "***unintentionally*** 'removed the lid''' from Cortes' $30,000 QBE policy, notwithstanding California's 40-day acceptance rule. (Ex 5 at 103; *supra* n.3) As the panel found,

> ACM was on notice of the [Cardonas'] demand letter on February 28: the envelope was stamped *FEB 28 2011* by [ACM's] mail room. ACM received a March 8 call from Sandro Cardona following up on his demand. [ACM's claims handler] Eison was required to contact him within 24 hours, but did not. A supervisor was to have been notified immediately. The person who told Sandro Cardona that he would receive a call back did not call back. It was only because [the Cardonas' counsel] called that ACM finally located the time limit demand letter and police report 30 days after they were actually received by ACM. ACM did not respond, request additional time or even acknowledge receipt of the demand letter.

(*Id.* at 93.) The panel's "starting point" for QBE's damages was thus "ACM's failure to timely review the [Cardonas'] letter demand, timely respond thereto and ultimately pay policy limits on behalf of Cortes," which "exposed QBE to multiple millions of dollars for settlement" of the Cortes/Cardonas cases "as well as related litigation expenses." (*Id.* at

---

[12] The only amounts Erigero thought ACM might avoid were QBE's attorneys' fees for defending Cortes and prosecuting the arbitration. (Ex 6 at 134.)

ACM's Opp'n to MSJ
3:18-CV-00925-JLS-MSB

103.) The panel found all but $30,000 of QBE's claimed damages resulted from ACM's handling of the Cardona demand, and awarded QBE more than $18 million in damages, including attorneys' fees and costs. (*Id.* at 103, 105.)

## I. Allied World Refuses to Cover ACM, Prompting this Litigation.

Faced with a huge judgment that could have been avoided by Allied World and Chubb, ACM promptly demanded payment by Allied World. (Ex 38 at 365.) Allied World balked, claiming the Policy never covered ACM's liability to begin with and denigrating ACM's defense counsel yet again by recommending ACM consider a malpractice claim against Erigero. (Ex 32 at 321.) It took another three months, after ACM had accrued interest on the Award, before Allied World finally paid what it contends was the remainder of its $5-million limits. (Ex 60 at 641; Ex 12 at 169 (calculating interest from date of Award).) ACM brought this case to recover the balance of the Award—approximately $4.9 million after accounting for $10 million contributed by Chubb—including interest, fees, and costs. (ECF No. 1 ¶¶ 3, 52; ECF No. 54 ¶¶ 3, 65.)

## III. ARGUMENT

### A. Allied World Tortiously Breached the Implied Covenant by Repeatedly Depriving ACM of Policy Benefits in Bad Faith.

Allied World's contention that ACM's bad-faith claim has "no support in the record" reflects a misunderstanding of the facts and law.  (Mot. 18.) ACM's claim is not "largely predicated" on Allied World's failure to *accept* settlement demands, nor is the insurance bad-faith doctrine so limited. (*Id.*) Bad faith is a fact-based assessment covering a range of insurer misconduct, and the evidence demonstrates that Allied World's bad faith permeated every aspect of its purported "defense" of ACM.

*First*, Allied World's focus on bad-faith cases in which an insurer rejects a reasonable settlement demand misses the mark. (*See* Mot. 18–23.) An insurer's duty to settle extends beyond just accepting "letter-perfect" settlement demands. *Allen v. Allstate Ins. Co.*, 656 F.2d 487, 490 (9th Cir. 1981). An insurer must use "reasonable *efforts* to settle a third party's lawsuit against the insured," which includes an obligation "to settle a claim against

its insured within policy limits whenever there is a substantial likelihood of a recovery in excess of those limits." *Howard v. Am. Nat'l Fire Ins. Co.*, 187 Cal. App. 4th 498, 524 (2010) (emphasis added); *Reid v. Mercury Ins. Co.*, 220 Cal. App. 4th 262, 272, 274–75 (2013) (recognizing "circumstances where no formal demand for settlement within policy limits is necessary for bad faith liability"). The insured need only demonstrate "*some circumstance* showing that [the insurer] knew settlement within policy limits was feasible." *Aspen Specialty Ins. Co. v. Willis Allen Real Estate*, 2015 WL 3765008, at *3 (S.D. Cal. June 15, 2015).

Settlement conduct, moreover, is just one facet of the implied covenant of good faith and fair dealing. *See e.g.*, *PPG Indus., Inc. v. Transamerica Ins. Co.*, 20 Cal. 4th 310, 314–15 (1999) ("This covenant imposes a number of obligations upon insurance companies, including an obligation to accept a reasonable offer of settlement."); *Walbrook Ins. Co. v. Liberty Mut. Ins. Co.*, 5 Cal. App. 4th 1445, 1455 (1992) ("[T]he issue of whether good faith was exercised covers a broad range of territory."). The implied covenant prohibits an insurer from doing ***anything*** that "injures the right" of the insured "to receive the benefits of the [insurance] agreement." *Commercial Union Assurance Cos. v. Safeway Stores, Inc.*, 26 Cal. 3d 912, 918 (1980). "In simple terms, an insurer's tortious bad faith conduct is conduct that is unreasonable," and "whether or not an insurer is guilty of bad faith is ordinarily a question of fact" tested "against the background of the totality of the circumstances." *Howard*, 187 Cal. App. 4th at 529; *Highlands Ins. Co. v. Cont'l Cas. Co.*, 64 F.3d 514, 517 (9th Cir. 1995); *Walbrook*, 5 Cal. App. 4th at 1455–56; Judicial Council of Cal. Civil Jury Instructions Nos. 2330, 2337 (non-exclusive list of sixteen bad-faith factors).

***Second***, Allied World repeatedly and unreasonably deprived ACM of the benefits of the Policy, including in the following ways:

- With zero investigation into his case-specific credentials, Allied World unilaterally appointed incompetent counsel to "defend" ACM, resulting in an assignment scheme so misguided that it created new "incredibly dangerous" exposure for QBE and ACM. *Supra* § II.C. Thus, even if ACM's initial handling of the Cardona demand were defensible, QBE (and thus ACM) could still be liable for extra-contractual damages. *Id.*

1    • Allied World conducted no independent investigation or analysis of the facts or

2    ACM's exposure, rendering it incapable of acting in ACM's best interests by attempting to

3    settle the QBE claim. *Supra* § II.C, F; *Travelers Ins. Co. v. Lesher*, 187 Cal. App. 3d 169, 191

4    (1986) (insurer has duty to "keep abreast of the progress and status of the litigation in order

5    that it may act intelligently and in good faith on settlement offers"), *disapproved of on other*

6    *grounds in Buss v. Sup. Ct.*, 16 Cal. 4th 35, 50 n.12 (1997). Jampol's incompetence only

7    compounded Allied World's lack of diligence by forcing Allied World and Jampol to simply

8    accept Belilove's inaccurate assessment of the Cardonas/Cortes litigation and refuse an

9    opportunity to resolve the Cardonas' claims for pennies on the dollar.[13] *Supra* § II.C.

10   • Despite multiple opportunities to settle within ACM's combined policy limits, Allied

11   World refused to meaningfully engage with QBE. *Supra* § II.D, G. First, Allied World

12   ignored QBE's June 2016 demand of $15 million, which was open for months without any

13   action by ACM's insurers. *Id.* Allied World claims that QBE's offer was already "above

14   ACM's available policy limits," but even if Allied World had paid $102,024.34 in ACM's

15   defense costs by June 2016,[14] that was still less than 1% of ACM's total policy limits. (Mot.

16   21.) If Allied World had ACM's interests in mind, it would have asked ACM to contribute

17   a small amount to settlement, or better yet, asked QBE to reduce its offer by an immaterial

18   amount. *Allen*, 656 F.2d at 490 ("An insurer's duty of good faith would be trifling if it did

19   not require an insurer to explore the details of a settlement offer that could prove extremely

20   beneficial to its insured."); *Shade Foods, Inc. v. Innovative Prods. Sales & Mktg., Inc.*, 78 Cal.

21   App. 4th 847, 906 (2000) ("[T]he duty to accept reasonable settlements [would be]

22

23   [13] Allied World attacks the Cardonas' § 998 offers because they did not come from QBE,
     and they exceeded Allied World's $5-million policy limits. (Mot. 22.) But QBE specifically
24   asked Allied World to settle two of the offers within Allied World's policy limits, and Allied
25   World never tried to negotiate with QBE to resolve ACM's liability at the same time. *Supra*
     § II.C; *see Blakenbaker v. Progressive Cas. Ins. Co.*, 2012 WL 12507762, at *8 (C.D. Cal. Dec.
26   17, 2012) (an insurer may act in good faith by accepting a settlement for an incomplete
27   release, *e.g.*, where one claim is "significantly less substantial than the others").

     [14] Allied World relies on a non-authenticated "Payment History" that does not actually
28   evidence Allied World's payment of anything. (ECF No. 99-9 at 21.)

meaningless it if did not entail a duty to negotiate toward a reasonable settlement."). Then, during the arbitration hearing, Allied World failed to respond to QBE's invitation for an offer above $10 million, even though Erigero had "handicap[ped]" ACM's liability at $12.5 million before the hearing, and things had already taken a turn for the worse for ACM with QBE's "devastating" cross-examination of ACM's President.[15] *Supra* § II.G.

- Allied World failed to tell ACM that it made its policy limits available before the arbitration hearing, eliminating ACM's ability to demand that Chubb resolve QBE's claim before the Award. *Supra* § II.F; *see Martin v. Hartford Accident & Indem. Co.*, 228 Cal. App. 2d 178, 184 (1964) ("An insured who is kept informed . . . may use powers of persuasion upon the carrier to increase its offer . . . ."). According to Allied World, this was ***exactly*** the plan: Chubb did not want ACM to know it had assumed "responsibility" for the QBE matter, and Allied World went along with and promoted the ruse. *Supra* § II.F–G.

- Allied World abdicated its duties as ACM's primary insurer by "deferring" to Chubb and purportedly letting Chubb assume "responsibility" for settlement with QBE, even though Chubb's excess policies did not come into play until Allied World's full policy limits were exhausted. *Supra* § II.F–G; *see also Cont'l Cas. Co. v. Royal Ins. Co.*, 219 Cal. App. 3d 111, 119 (1990) ("There is no authority" charging an excess carrier "with making sure the primary carrier fulfills its good faith obligations to the insured.").

- Allied World made a low-ball $2.5-million settlement offer to QBE, even though Erigero had already "handicap[ped]" ACM's liability at $12.5 million, and warned Allied World that it would need to offer at least $5 million just to ███████████. *Supra* § II.E. Allied World's ill-conceived tactic violated its own practices and California law. (Ex 67 at 729–30 (an "unreasonably low settlement offer . . . would be

---

[15] ACM is not seeking to hold Allied World liable for failing to "initiate" settlement discussions. (Mot. 21–22.) QBE made clear on multiple occasions it was willing to settle and that it would consider an offer well within ACM's policy limits. *Supra* § II.D, E, G. *Graciano v. Mercury General Corp.* is distinguishable because the insurer there had reached out to the insured and offered policy limits, but was "rebuffed." 231 Cal. App. 4th 414, 429 (2014). Allied World never offered its policy limits to settle for ACM.

against claims handling practices at Allied World")); Cal. Code Regs. tit. 10 § 2695.7(g) ("No insurer shall attempt to settle a claim by making a settlement offer that is unreasonably low."); *DeFrenza v. Progressive Express Ins. Co.*, 345 F. Supp. 3d 1243, 1255–56 (E.D. Cal. 2017) ("Where an insurance company fails to follow its own procedures to the detriment of an insured an inference of bad faith can be drawn.").

- Allied World essentially abandoned ACM by failing even to attend the arbitration hearing, despite raising concerns just days earlier about defense counsel's readiness, and instead sending an unfamiliar junior lawyer with no settlement authority in Allied World's place. *Supra* § II.F. Under the circumstances, it is not surprising that Allied World failed to engage in settlement negotiations during and after the hearing.

- Allied World refused to pay even its remaining policy limits until months after the Award issued, knowingly causing ACM to accrue interest, and is now forcing ACM to defend itself from claims for full reimbursement of those proceeds based on inapplicable coverage exclusions. (Ex 60 at 641; Ex 12 at 169); *Howard*, 187 Cal. App. at 531 (insurer acts in bad faith by refusing to indemnify after judgment entered).

Each of these numerous examples, even when viewed in isolation, is sufficient to defeat Allied World's motion for summary judgment on ACM's bad-faith claim.

***Finally***, Allied World's claim that it had no reasonable opportunity to settle is foolish. (Mot. 19–20.) Regardless of what exposure defense counsel "predicted" for the Cortes/Cardonas and QBE matters, both indisputably resulted in judgments significantly exceeding counsel's estimates. *Supra* § II.C, H. In such circumstances, the size of the award, "although not conclusive, furnishes an inference that the value of the claim is the equivalent of the amount of the award" when assessing an insurer's bad faith. *Mattson v. United Servs. Auto. Ass'n*, 2019 WL 2330087, at *7 (S.D. Cal. May 31, 2019).

Moroever, Belilove's August 2014 analysis—to which Allied World points to suggest the Cardonas' § 998 offers were "unreasonable"—had numerous caveats, failed to account for key aspects of damages, and preceded Cortes' own attack on the assignment. *Supra* § II.C. Even Jampol recognized that Belilove's analysis was way off. *Id.* Because of his

1  inexperience, though, Jampol was in no position to test Belilove's analysis and provide a

2  realistic assessment of QBE's and ACM's exposure until the § 998 offers expired. *Id.*

3        In addition, Erigero's June 2016 ($7.5–10 million) and March 2017 ($12.5 million)

4  liability estimates were just that—estimates. Erigero consistently warned of ACM's

5  potential exposure to QBE, even recognizing a possible verdict of $16 million. *Id.* For

6  Allied World now to suggest that Erigero's "handicap[s]" rendered any settlement demand

7  above those estimates "unreasonable" flies in the face of its own expert's admission that

8  estimating liability is "an inexact science to say the least." (Ex 68 at 737–38, 741–42.) In

9  this respect, *Nat'l Union Fire Ins. Co. v. Markel Ins. Co.* is inapposite. There, the verdict was

10  not "even within the realm of possibility" and thus the insurer reasonably relied on

11  counsel's assessment of limited exposure. 2018 WL 5095267, at *2 (C.D. Cal. Sept. 27,

12  2018). By contrast, Erigero made clear a $15-million+ verdict was possible. (Ex 21 at 247.)

13        Finally, even if Allied World could rely entirely on Erigero's pre-hearing $12.5-

14  million estimate, it still should have attempted to settle the case during the hearing, after

15  ACM suffered a "devastating" cross-examination and QBE expressed its continued

16  willingness to compromise for an amount over $10 million. *Supra* § II.G. As Allied World's

17  expert also admitted, case evaluations change, including based on how "witnesses

18  perform." (Ex 68 at 741–42.) Nobody with relevant experience attended the hearing for

19  Allied World, so no revised analysis was apparently performed. *Supra* § II.F.

20        In sum, ACM has presented a multitude of evidence raising at least a genuine dispute

21  of material fact as to whether Allied World should be liable for bad faith.

22      **B.**   **Allied World Breached its Duty to Defend by Unilaterally Appointing**
23           **and Controlling Incompetent Counsel.**

24        Nor is Allied World entitled to judgment on ACM's duty-to-defend claim.

25        *First*, Allied World does not dispute its duty to appoint competent counsel, nor that

26  counsel's competence is a question of fact. (*See* Mot. 24–25.) Instead, Allied World claims

27  that ACM "admitted" Jampol's competence. (*Id.* 10–11, 24.) Schraner simply recognized

28  that Jampol had a "good reputation" based on a single prior interaction, and expressed his

1  personal opinion that Jampol was not "incompetent." (Ex 76 at 837.) Patel believed Jampol

2  was competent because "[h]e was appointed by [Allied World] as an expert, so we relied

3  on him and thought he was an expert." (Ex 75 at 826–27.) These are not "admissions" of

4  a key disputed fact in this case.

5      In truth, Jampol had no experience with auto accident cases, and he had never

6  handled a bad-faith case involving the notorious law firm representing the Cardonas. *Supra*

7  § II.C. His incompetence was borne out through his dangerous assignment scheme and his

8  unquestioning reliance on Belilove's case evaluation. *Id.* Allied World effectively admitted

9  Jampol's incompetence by settling professional negligence claims. (Ex 77 at 857.)

10      ***Second***, even if Jampol were competent, when appointed counsel's independence

11  is compromised and he is controlled and directed by the insurer, the insurer is liable for

12  counsel's negligence. *Lesher*, 187 Cal. App. 3d at 191; *Merritt v. Reserve Ins. Co.*, 34 Cal. App.

13  3d 858, 880 (1973). ACM has presented more than sufficient evidence to raise a genuine

14  dispute of material fact regarding Allied World's control and direction of Jampol.[16] Jampol

15  admits that he could never have proceeded with the assignment—or anything else in

16  ACM's "defense"—without Allied World's permission. (Ex 73 at 807; Ex 72 at 787.)

17  Arruda even directed Jampol to a bilingual lawyer to present the assignment to Cortes. (Ex

18  72 at 801–02; Ex 73 at 808; *see also* Ex 33 at 324.) This is clear direction and control, made

19  clearer in light of Jampol's financial relationship with Allied World: in ten years, Allied

20  World appointed Jampol's firm at least 63 times. (ECF No. 35-2, ¶¶ 9–10.) Jampol's partner

21  summed it up: ████████████████████████████ (Ex 51 at 523.)

22      In sum, ACM has presented more than sufficient evident to raise a genuine dispute

23  of material fact that Allied World breached its duty to defend.[17]

[16] Judge Berg did not decide a central, disputed question of fact in this case; he resolved a question of privilege involving separate ACM counsel. (*See* Mot. 11; ECF No. 73.)

[17] ACM's recovery for breach of the duty to defend is not limited to Jampol's fees. *See Comunale v. Traders & Gen. Ins. Co.*, 50 Cal. 2d 654, 659–61 (1958).

ACM's Opp'n to MSJ
3:18-CV-00925-JLS-MSB

**C.     Allied World Breached its Duty to Indemnify At Least by Failing to Timely Cover ACM's Losses.**

Finally, Allied World is not entitled to summary judgment on ACM's duty-to-indemnify claim. (*See* Mot. 25.) QBE's claim against ACM is covered under the Policy, *infra* § III.D, and Allied World breached its duty to indemnify at least by refusing to pay its remaining policy limits when the Award issued, causing ACM to accrue unnecessary interest. (Ex 12 at 169.) Allied World offers no support for its position that confirmation of the Award—and not the Award itself—triggers its duty to indemnify. (*See* Mot. 2, 25.)

**D.     ACM's Coverage is Not Excluded.**

**1.     Endorsement No. 9 is Inapplicable.**

Endorsement No. 9 excludes coverage for Claims based on, *inter alia*, a "lack of good faith or fair dealing in the handling of any claim or obligation arising under an insurance contract or policy"—*i.e.*, bad faith. (Ex 1 at 16.) ACM's coverage is not excluded.

*First*, Endorsement No. 9 makes clear that **ACM** must have handled an insurance claim in bad faith. (Ex 1 at 16.) The endorsement specifically provides that "if any **Insured** in fact engaged in the conduct specified [in] this Exclusion, such **Insured** . . . will reimburse the Insurer for any Defense Expenses advanced to or on behalf of such **Insured**." (*Id.*) Allied World ignores this unambiguous language—which identifies *who* must have acted in bad faith for the exclusion to apply—because, as a matter of California law, QBE owes the duty of good faith and fair dealing to its policyholders when it comes to handling any claim or obligation arising under an insurance contract or policy. *Egan v. Mut. of Omaha Ins. Co.*, 24 Cal. 3d 809, 824 (1979); *Reno v. Nat. Union Fire Ins. Co. of Pittsburg*, 2016 WL 4597524, at *2–3 (S.D. Cal. Mar. 25, 2016)).[18] Thus, in the circumstances of this case, ACM cannot have acted in the requisite bad faith to implicate Endorsement No. 9.

Allied World tries to circumvent this well-established law by arguing that ACM's plain-language construction would render Endorsement No. 9's bad-faith exclusion "a

[18] *Greenwich Ins. Co. v. Med. Mut. Ins. Co. of N.C.* is inapposite because the policyholder was itself an insurer, and thus could be liable for bad faith. 88 F. Supp. 3d 512 (E.D.N.C. 2015).

nullity." (Mot. 16.) But several overriding principles of interpretation strongly favor ACM's reading: (1) exclusionary clauses are "construed strictly against the insurer and liberally in favor of the insured," and (2) "courts will not sanction a construction of the insurer's language that will defeat the very purpose or object of the insurance." *Miller v. Elite Ins.*, 100 Cal. App. 3d 739, 751 (1980); *Gray v. Zurich Ins. Co.*, 65 Cal. 2d 263, 278 (1966). The latter rule is particularly critical here, because Allied World's application of Endorsement No. 9 would strip ACM of the "No. 1 reason" it obtained insurance from Allied World in the first place. *Supra* § II.A. Even Allied World recognizes that "bad faith" coverage is exactly the "cover [TPAs like ACM] need." (Ex 29 at 289); *see also Church Mut. Ins. Co. v. U.S. Liab. Ins. Co.*, 347 F. Supp. 2d 880, 886 (S.D. Cal. 2004) ("[T]he evisceration of coverage, which results if [the insurer's] interpretation is adopted, indicates that the parties apparently did not intend the exclusion to be read so expansively.") By contrast, Allied World admitted that its Policy form was designed to cover a broad range of professionals under Allied World's internal designation of "miscellaneous" lines, (Ex 67 at 727–28), meaning that Endorsement No. 9's bad-faith exclusion could plausibly apply in other circumstances, to different insureds, or perhaps under different state law.[19] That none of those circumstances exists here does not render the bad-faith exclusion a "nullity"; it just means the exclusion does not apply to ACM's coverage in this case. (*See* Mot. 16.)

**Second**, even assuming the bad-faith exclusion could apply to ACM's claim under the Policy, Endorsement No. 9 requires its "applicability" to be established by an "admission, final adjudication or a finding" of bad faith. (Ex 1 at 16; Ex 62 at 657–659.) Allied World attempts to dodge this requirement by arguing that the exclusion's "may" language is permissive, not mandatory. (Mot. 15.) Not so: there are multiple ways the applicability of the bad-faith exclusion "***may***" be determined—through an admission, final adjudication, *or* finding, in the proceeding constituting the Claim *or* in a separate

---

[19] Allied World claims the Policy was "negotiated" based on a single, irrelevant exclusion for "structured settlements." (Mot. 3, 16.) The bad-faith exclusion is standard-form Allied World language that ACM did not negotiate. (Ex 76 at 833–34, 836.)

proceeding—but, given the short list of ways it *may* be determined, it *must* be determined in one of those ways. (Ex 1 at 16.) Any other interpretation would render the "applicability" language superfluous, contrary to the mandate that contracts be interpreted to give effect to all provisions. Cal. Civ. Proc. Code § 1858. Allied World has failed to demonstrate that its interpretation of Endorsement No. 9 is the only reasonable one. *Ventura Kester, LLC v. Folksamerica Reins. Co.*, 219 Cal. App. 4th 633, 641 (2013) ("[I]nsurer must establish its interpretation of the policy [exclusion] is the only reasonable one.").

Allied World's "permissive" interpretation is also inconsistent with both its and Chubb's positions in the past. Allied World points to numerous documents that purportedly contain allegations of bad faith. (Mot. 5–6.) Yet, until late 2017, after the Award came down, Allied World and Chubb repeatedly recognized that a finding or adjudication of bad faith was required to exclude coverage. (Ex 15 at 179; Ex 62 at 660–61; Ex 13 at 173; Ex 11 at 158, 164; Ex 52 at 535; Ex 37 at 351; Ex 29 at 289 (recognizing the bad-faith exclusion is effectively "null and void with the 'finding in fact' requirement").) The Court should reject Allied World's *post facto* "permissive" interpretation.

Finally, Allied World points to no "admission, final adjudication or a finding" that anyone acted in bad faith. A fair reading of Judge Rogers' February 2016 *discovery* order reveals no such conclusion.  (*See* Ex 58.) Judge Rogers assumed facts "as they appear from the pleadings and the moving paperwork," and determined that "there is a colorable claim that Cortes could pursue a bad faith claim against QBE . . . ." (*Id.* at 632–33.) Judge Rogers further noted the "claims Cortes might have against QBE" and "the potential of an insurance bad faith claim" against QBE. (*Id.* at 633–34.) Nor did the arbitration panel find that QBE acted in bad faith. Rather, the panel recognized that QBE settled with the Cardonas and Cortes in light of its "substantial exposure." (Ex 5 at 87.) And even if ACM's handling of the Cardona claim "*unintentionally* 'removed the lid'" from the Cortes QBE policy and "exposed QBE to multiple millions of dollars for settlement of several related cases," the panel never found QBE or ACM acted in bad faith. (*Id.* at 103); *see also McDaniel v. Gov't Employees Ins. Co.*, 681 F. App'x 614 (9th Cir. 2017) (negligence is not bad faith).

2. **The Fraud Exclusion is Inapplicable.**

The Policy also excludes coverage for a "**Claim** . . . against [ACM] brought about or contributed to by any dishonest or fraudulent act or omission or any willful violation of any statute, rule, or law by [ACM]." (Ex 1 at 24.) The "applicability" of the fraud exclusion also hinges on an "admission, final adjudication or a finding." (*Id.*) As Allied World admits, a "dishonest or fraudulent act or omission" also requires dishonest or fraudulent "intent" on ACM's part. (Ex 64 at 701–03.) ACM's coverage is not excluded.

*First*, Allied World points to no admission, finding, or adjudication of fraud or dishonest conduct. While the arbitration panel found "much to be critical of ACM for," it declined to award QBE punitive damages based on any alleged fraud. (*See* Ex 5 at 102.) Moreover, even if ACM lost credibility by arguing that it did not receive the Cardonas' demand on February 28, 2011, ACM was never intentionally dishonest. (*Id.* at 93.) In fact, ACM still cannot say for sure that it received the Cardonas' letter on that date. (Ex 75 at 824–25; Ex 61 at 645; *see also* Ex 30 at 292 ("There is a question as to whether the [Cardonas'] letter was, in fact, received by ACM on February 28, 2011.").

*Second*, Allied World fails to demonstrate that any fraud or dishonest act "brought about or contributed to" QBE's claim. (Ex 1 at 24.) Allied World's suggestion that the panel's credibility assessment resulted in an "award well beyond any prior expectations" is pure speculation. (AWAC 17.) The panel recognized the cause of QBE's damages as ACM's handling of the Cardona demand. (*Id.* at 19.) QBE's fees and expenses for defending the Cardona/Cortes actions, moreover, "were the direct result of ACM's failure to resolve the [Cardona] claim within policy limits." (*Id.*) Thus, any conduct by ACM *after* the Cardonas' demand expired—including in the arbitration itself—is incidental and could not have "brought about" or even "contributed to" QBE's claim. (*See* Ex 1 at 24.) The panel confirmed this by awarding QBE damages based on ACM's negligence or deficient performance, not fraud or dishonesty. (Ex 5 at 102–05.)

### 3. The Contract Exclusion is Inapplicable.

Finally, the Policy excludes coverage for a "**Claim** . . . for any actual or alleged liability under any express contract or agreement, **unless** such liability would have attached in the absence of such contract or agreement." (Ex 1 at 25.) The exception is key because "the whole point of the [Policy is] to protect ACM in the performance of its claims services," which are performed under contract. (Ex 76 at 831–35.) Thus, if a contract claim arises from ACM's negligence—for which ACM would be liable anyway—the Policy still provides coverage. (*See* Ex 29 at 287.)[20]

Allied World does not dispute that ACM could have been liable to QBE under common-law negligence principles, or that QBE asserted negligence-based claims against ACM from the start. (*See* ECF No. 72 at 11–14; Mot. 5; *supra* § II.D.) Instead, Allied World contends that ACM "has not established a record to support this argument." (Mot. 17). The panel's findings are evidence enough: (1) ACM was on notice of the Cardonas' demand in advance of the deadline to accept, but failed to locate the demand until 30 days after receipt; (2) ACM failed to timely respond to follow-up calls from the Cardonas; (3) ACM adjusters failed to notify their supervisors of the policy-limits demand; and (4) ACM failed to respond, request additional time to respond, or even acknowledge receipt of the demand. (Ex 5 at 93.)[21] Even ACM's counsel recognized that the "evidence presented at arbitration" supported a claim that ACM was negligent, and Allied World apparently agrees. (Ex 66 at 721; Ex 6 at 133; ECF No. 5-1 at 1 (ACM "disastrously mishandled" the Cardona demand).) Nothing further is required.

## IV. CONCLUSION

For these reasons, the Court should deny Allied World's motion in its entirety.

---

[20] QBE's recovery of attorneys' fees for the arbitration, less than 3% of the Award, could not depend on the "CMA's indemnity provision," which would be contrary to law. (Mot. 17–18; Ex 5 at 105); *Carr Bus. Enters., Inc. v. City of Chowchilla*, 166 Cal. App. 4th 14 (2008).

[21] The relevant inquiry—whether ACM "*would*" have been liable to QBE in the absence of a contractual duty—should be assessed on the facts found by the panel, not ACM's defensive positions during the arbitration or current opinions. (*See* Mot. 17–18.)

1    Dated:     December 5, 2019            COOLEY LLP

2

3                                           By: */s/ William V. O'Connor*
                                               William V. O'Connor (216650)
4

5                                           Attorneys for Plaintiff and Counterclaim-
                                            Defendant AMERICAN CLAIMS
6                                           MANAGEMENT, INC.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28