1
2
3
4
5
6
7                    UNITED STATES DISTRICT COURT

8                  SOUTHERN DISTRICT OF CALIFORNIA

9

10   AMERICAN CLAIMS MANAGEMENT,          Case No.:  18-CV-925 JLS (MDD)
     INC.,
11                                        **ORDER GRANTING DEFENDANT'S**
                              Plaintiff,  **MOTION FOR SUMMARY**
12                                        **JUDGMENT**
     v.
13
     ALLIED WORLD SURPLUS LINES
14   INSURANCE COMPANY (f/k/a Darwin      (ECF No. 133)
     Select Insurance Company),
15
                              Defendant.
16

17

18        Presently before the Court is Defendant's Motion for Summary Judgment ("MSJ,"

19   ECF No. 133), Plaintiff's Opposition to the Motion ("Opp'n," ECF No. 137), and

20   Defendant's Reply ("Reply," ECF No. 134).[1]  After reviewing the briefs, the evidence, the

21   law, and hearing oral arguments, *see* ECF No. 143, the Court **GRANTS** Defendant's

22   Motion.

23                              **BACKGROUND**

24        Plaintiff American Claims Management, Inc. is a third-party claims handler for

25   insurance companies.  Opp'n at 7.  Defendant Allied World Surplus Lines Insurance

26   _____

27   [1] The Parties previously filed redacted copies of their respective briefs, along with motions to seal.  After
     the Court granted in part and denied in part the motions to seal, the Parties refiled the briefs now before
28   the Court.

Company, formerly known as Darwin Select Insurance Company, insured Plaintiff under a Professional Liability Insurance Policy (the "ACM Policy") from October 1, 2010 to October 1, 2011.  Declaration of Dane Voris ("Voris Decl.") Ex. 1 at 11.  The events that led to this litigation involve multiple parties with various connections between them:



Mot. at 7.

During the relevant claims period, Plaintiff acted as a third-party administrator for QBE Insurance Corporation.  Voris Decl. Ex 4; Ex. 7 at 137.  In 2011, QBE issued an automotive insurance policy to Galdino Cortes with a $30,000 policy limit.  *See id.* Ex. 40 at 401.  Mr. Cortes caused a car accident which injured members of the Cardona family. *Id.* Ex. 7 at 137.  The Cardona family sent a policy limit demand to Plaintiff, but Plaintiff failed timely to resolve the claim within Mr. Cortes' policy limits.  *Id.* at 138. Subsequently, Plaintiff notified Defendant that QBE might bring a claim against Plaintiff related to its mishandling of the Cardona matter, and Defendant assigned an adjuster to the matter.  *Id.* Ex. 40 at 395–96.

///

The Cardona family then sued Mr. Cortes.  *Id.* Ex. 7 at 138.  In March 2014, as the claim approached trial, Defendant appointed attorney Alan Jampol of Jampol Zimet as counsel for Plaintiff.  *Id.* Ex. 13 at 173.  Shortly after being appointed as counsel, Mr. Jampol orchestrated an assignment agreement whereby QBE would pay Mr. Cortes to assign his extra-contractual rights under his insurance policy back to QBE.  *Id.* Ex. 39; Ex. 58 at 634.  Plaintiff, Defendant, and QBE agreed to pursue the assignment.  *See Id.* Ex. 76 at 841–44.  Mr. Cortes signed the assignment agreement while he was in prison and without an attorney present.  *Id.* Ex. 7 at 139.

The Cardona claim proceeded to trial, and, in June 2015, the Cardona family won a $21 million jury verdict against Cortes.  *Id.* Ex. 7 at 138.  Cortes then challenged the QBE assignment and sued QBE for bad faith.  *Id.*  Evaluating the assignment in 2016, Judge Randolph A. Rogers of the Los Angeles Superior Court called the assignment scheme "contrary to public policy" and "sufficient to support a prima facie claim for fraud."  *Id.* Ex. 39; Ex. 58 at 634.  QBE eventually settled with Cortes and the Cardonas, paying $15 million.  Declaration of Guyan Knight ("Knight Decl.") Ex. 2 at 597–98.

In October 2015, QBE filed an arbitration demand against Plaintiff for reimbursement of all amounts paid to settle the Cardona matter.  Voris Decl. Ex. 7 at 138; Ex. 53; Ex. 54.  On July 24, 2017, the arbitration panel issued its decision and awarded QBE $18.5 million in damages.  *Id.* Ex. 5 (the "Arbitration Award").

Plaintiff demanded Defendant pay its portion of the arbitration award and three months later, Defendant forwarded its policy limits to fund partially the arbitration judgment under a reservation of rights.  *Id.* Ex. 38 at 365.  The policy limits did not cover all of Plaintiff's liability—approximately $4.9 million of the judgment remains unfunded after Defendants and excess insurer Chubb's payments.  *Id.*  Plaintiff filed its original complaint on May 11, 2018 to recover this unfunded amount.  *See generally* ECF No. 1. The Court now considers the Motion for Summary Judgment before it.

///

///

**LEGAL STANDARD**

Under Federal Rule of Civil Procedure 56(a), a party may move for summary judgment as to a claim or defense or part of a claim or defense.  Summary judgment is appropriate where the Court is satisfied that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  Material facts are those that may affect the outcome of the case.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A genuine dispute of material fact exists only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.*  When the Court considers the evidence presented by the parties, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  *Id.* at 255.

The initial burden of establishing the absence of a genuine issue of material fact falls on the moving party.  *Celotex*, 477 U.S. at 323.  The moving party may meet this burden by identifying the "portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,'" that show an absence of dispute regarding a material fact.  *Id.*  When a plaintiff seeks summary judgment as to an element for which it bears the burden of proof, "it must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial."  *C.A.R. Transp. Brokerage Co. v. Darden Rests., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (quoting *Houghton v. South*, 965 F.2d 1532, 1536 (9th Cir. 1992)).

Once the moving party satisfies this initial burden, the nonmoving party must identify specific facts showing that there is a genuine dispute for trial.  *Celotex*, 477 U.S. at 324.  This requires "more than simply show[ing] that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  Rather, to survive summary judgment, the nonmoving party must "by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts'" that would allow a reasonable fact finder to return a verdict for the non-moving party.  *Celotex*, 477 U.S. at 324.  The non-moving party cannot oppose a

properly supported summary judgment motion by "rest[ing] on mere allegations or denials of his pleadings." *Anderson*, 477 U.S. at 256.

## ANALYSIS

Defendant argues that judgment in its favor is appropriate because (1) three different policy exclusions apply and bar coverage for Plaintiff, Mot. at 14–18; (2) Plaintiff has failed to show any record evidence able to support its bad faith claim, *id.* at 18–23; and (3) Defendant satisfied its duty to defend and indemnify, *id.* at 24–25. Defendant also contends the Court should enter judgment on its counter claim for reimbursement of the money it paid Plaintiff under the policy. *Id.* at 25. The Court considers each argument in turn.

### I.   Policy Exclusions

There are three exclusions in the ACM Policy at issue: (1) the "Claims Services Exclusion"; (2) the "Fraud or Dishonest Act Exclusion"; and (3) the "Contract Exclusion." Defendant contends that all three apply and bar coverage. Mot. at 14–25. Plaintiff disagrees and offers its own interpretations of the exclusions, under which none apply. Opp'n at 26–30.

"While insurance contracts have special features, they are still contracts to which the ordinary rules of contractual interpretation apply." *N. Am. Bldg. Maint., Inc. v. Fireman's Fund Ins. Co.*, 137 Cal. App. 4th 627, 641 (2006). The goal of interpreting an insurance policy to give effect to "the mutual intention of the parties and, where possible, to infer this intent from the terms of the policy." *Haynes v. Farmers Ins. Exch.*, 32 Cal. 4th 1198, 1204 (2004). The court will look no further than the terms of the policy if the "language is clear and explicit," *Bank of the W. v. Super. Ct.*, 2 Cal. 4th 1254, 1264 (1992) (citing Cal. Civ. Code § 1638), and will interpret the words in the policy according to their "ordinary and popular sense." *Haynes*, 32 Cal. at 1204 (citing *AIU Ins. Co. v. Super. Ct.*, 51 Cal. 3d 807, 822 (1990)).

"On the other hand, if the terms . . . are in any respect ambiguous or uncertain," *Bank of the W.*, 2 Cal. 4th at 1264 (internal quotations omitted), the Court must "give effect to

the insured's objectively reasonable expectations." *Kavruck v. Blue Cross of Cal.*, 108 Cal. App. 4th 773, 780 (2003). A policy provision in an insurance contract is ambiguous if it is capable of two or more reasonable constructions. *Waller v. Truck Ins. Exch., Inc.*, 11 Cal. 4th 1, 18 (1995). But policy provisions "cannot be found ambiguous in the abstract," *id.* (citing *Bank of the W.*, 2 Cal. 4th at 1265), and the "Court will not strain to create an ambiguity where none exists." *Id.* (citing *Reserve Ins. Co. v. Pisciotta*, 30 Cal. 3d 800, 807 (1982)).

In addition to the general interpretation principles for insurance policies, "[p]articular rules apply to the interpretation of insurance policy exclusions." *N. Am. Bldg. Maint.*, 137 Cal. App. 4th at 642. "[E]xclusionary clauses are strictly construed against the insurer and in favor of the insured." *Id.* "[A]lthough the insured has the burden of proving the contract of insurance and its terms, the insurer bears the burden of bringing itself within a policy's exclusionary clauses." *Id.* (citation omitted). "An insurer may rely on an exclusion to deny coverage only if it provides *conclusive evidence* demonstrating that the exclusion applies . . . in all possible worlds." *Atl. Mut. Ins. Co. v. J. Lamb, Inc.*, 100 Cal. App. 4th 1017, 1039 (2002). If the insurer meets this burden, a majority of courts then shift the burden back onto the insured to prove that an exception to the exclusion applies. *See* 17A Plitt, Steven et al., *Couch on Ins.* § 254:13 (3rd ed. 2018) (collecting cases); *cf. Travelers Cas. & Sur. Co. v. Super. Ct.*, 63 Cal. App. 4th 1440, 1454 (1998) (placing burden of proof on insured to prove exception to a policy exclusion).

## A.   The Claims Services Exclusion

Defendant first argues that the Claims Services Exclusion applies and bars coverage. Mot. at 21–24. The Claims Services Exclusion is contained in a manuscript endorsement which excludes coverage for any loss or claim that is:

> based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any actual or alleged:

(1) lack of good faith or fair dealing in the handling of any claim or obligation arising under an insurance contract or policy or from any benefit plan;

. . .

The applicability of Exclusion (1) above may be determined by an admission, final adjudication or a finding in the proceeding constituting the Claim or in a proceeding separate from or collateral to the Claim.  If any Insured in fact engaged in the conduct specified in this Exclusion, such Insured and the Named Insured will reimburse the Insurer for any Defense Expenses advanced to or on behalf of such Insured.

ACM Policy, Endorsement No. 9.

Construing the language in favor of Plaintiff, the Court finds the Exclusion's meaning is "clear and explicit"—the Exclusion applies if Plaintiff seeks coverage for a claim that (1) arises out of or involves any actual or alleged lack of good faith or fair dealing (2) in the handling of any claim or obligation under an insurance policy, (3) which may be determined only by an admission, final adjudication, or a finding in the claim proceeding or any other proceeding collateral to the claim.  According to this explicit language, the Court finds Defendant has met its burden to show the Claims Services Exclusion applies and thus bars coverage.  Plaintiff's coverage claim arises out of and involves QBE's allegation that Plaintiff handled its obligations under the Cortes insurance policy in bad faith, and the allegation of bad faith can be determined by the arbitration panel's final order.

First, the Court finds Plaintiff's claim "arises out of" an allegation of bad faith. Under California law, the phrase "arising out of" is construed broadly, requiring only a "minimal causal connection or incidental relationship" between the "factual situation" and "the event creating liability." *Acceptance Ins. Co. v. Syufy Enterprises*, 69 Cal. App. 4th 321, 328 (1999).  And this Exclusion is even broader, allowing claims "directly or indirectly resulting from, in consequence of, or in any way involving" the alleged bad faith. Here, Plaintiff's coverage claims stems from its initial handling of the Cortes claim.  In its opening brief of the Arbitration, QBE's sixth cause of action alleged Plaintiff carried out its claims handling obligations in bad faith, leading to extra-contractual liability.  *See*

Knight Decl. Ex. 49. Plaintiff now seeks coverage for its liability to QBE. The Court finds this satisfies the "minimal causal connection" required to show that Plaintiff's claims arise out of an allegation of bad faith.

Important to this finding, the Court notes that for the exclusion to apply, all that is necessary is for the claim to arise out of or involve an *allegation* of bad faith. Instructive here, a North Carolina court discussed the implications of the term "allegation" in an almost identical exclusion in *Greenwich Insurance Company v. Medical Mutual Insurance Company of North Carolina*, 88 F. Supp. 3d 512 (2015). There, the policy "exclude[ed] from coverage all 'loss, including defense expenses, resulting from any claim for . . . any actual *or alleged* lack of good faith or unfair dealing in the handling of any claim or obligation under any insurance contract.'" *Id.* at 516. The court found that based on the exclusion's plain terms, "any loss resulting from any claim, no matter upon what legal theory that claim is based, that is merely alleged to be proximately caused by" the insured's lack of good faith would be excluded from coverage. *Id.* "Thus, even if the trier of fact in the [underlying action] finds" no bad faith, "there is no coverage under the . . . policy if the [underlying] complaint alleged a lack of good faith and fair dealing in [the insured]'s handling of" an insurance policy claim. *Id.*

The Court finds this interpretation persuasive. For the Claims Services Exclusion to apply, the Court need only find that Plaintiff's claim arises out of an allegation of bad faith; the actual determination of that claim matters not. As noted above, QBE alleged Plaintiff handled the Cortes claim in bad faith. Under the exclusion's clear and explicit meaning, that is enough.

Second, the Court finds the allegation of bad faith arises from the "handling of any claim or obligation arising under an insurance contract or policy." Plaintiff contends that this phrase indicates the exclusion applies only to a party that could be liable for bad faith under an insurance policy; in other words, Plaintiff must be potentially liable to the insured. Opp'n at 26. Plaintiff argues that because Plaintiff is as a third party to the Cortes insurance policy, it cannot be liable to Cortes for bad faith, and thus the Exclusion cannot apply. *Id.*

It is true that a third-party administrator cannot be liable to the insured for bad faith. *See Egan v. Mut. of Omaha Ins. Co.*, 24 Cal. 3d 809, 824 (1979).  But that principle does not illuminate the proper interpretation of this exclusion's meaning.  The Exclusion states only that the lack of good faith and fair dealing must have arisen from the "*handling* of any claim or obligation arising under an insurance contract or policy."  It does not require Plaintiff to have issued the policy under which the claim arose or otherwise be liable for bad faith to the policy holder.  For the Court to demand actual or potential liability to QBE's policy holder for the Claims Services Exclusion to apply, it would require the addition of words and phrases not found in the Exclusion itself, which the Court cannot do.  *See Safeco Ins. Co. of Am. V. Robert S.*, 26 Cal. 4th 758, 763 (2001) (declining to read words into an exclusion because "[t]o do so would violate the fundamental principle that in interpreting contracts, including insurance contracts, courts are not to insert what has been omitted").  Important here, Plaintiff had a contractual obligation to handle QBE's insurance policy claims. As in any contract, Plaintiff had a duty to carry out this obligation to QBE in good faith.  QBE alleged Plaintiff's handling of its obligation to service the Cortes claim was done in bad faith.  That is sufficient for the Exclusion to apply.

In addition to being contrary to the plain meaning, Defendant contends that Plaintiff's interpretation requiring actual liability for bad faith would make the Claims Services Exclusion superfluous.  Mot. at 23–24.  When interpreting an insurance policy, the Court "must interpret [the policy] to give effect to all of its terms and avoid an interpretation that renders a term mere surplusage."  *S. Cal. Counseling Ctr. v. Great Am. Ins. Co.*, 162 F. Supp. 3d 1045, 1050, 1053 (C.D. Cal. 2014), *aff'd*, 667 F. App'x 623 (9th Cir. 2016).   Here, Plaintiff is a third-party claims administrator and does not issue insurance—as Plaintiff has repeatedly noted, it therefore could never be liable for bad faith to an insured.  Under this interpretation, the exclusion would never apply.  Thus, the Court must reject Plaintiff's interpretation; to do otherwise would "render the . . . exclusion a nullity."  *Id.*

///

1  Plaintiff attempts to dodge the nullity problem by arguing that the Exclusion is a

2  standard form used by Defendant in other policies,[2] which indicates that under "other

3  circumstances, to different insureds, or perhaps under different state law," the Exclusion

4  might apply.  Opp'n at 27.  This argument is without merit.  "A standard form contract is

5  governed by the ordinary rules of interpretation of contracts."  *Mid-Century Ins. Co. v.*

6  *Bash*, 34 Cal. Rptr. 382, 385 (Ct. App. 1989).  And the Court must interpret the policy's

7  language to give effect to the intentions of the parties to the contract, not hypothetical out-

8  of-state parties that may sign a similar endorsement.

9  Third, the Court finds the Claim Services Exclusion's applicability "may be

10  determined by an admission, final adjudication, or a finding in the proceeding constituting

11  the Claim or in a proceeding separate from or collateral to the Claim."  ACM Policy,

12  Endorsement No. 9.  Defendant contends the term "may" in this phrase is permissive and

13  allows the Court to determine the applicability from any source, even those not listed.  Mot.

14  at 22–23.  Plaintiff, on the other hand, contends that "may" is permissive only to the extent

15  the Court may determine the applicability from the listed sources, but no others.  Opp'n at

16  27–28.  While the Court agrees with Defendant that "may" is generally understood to be

17  permissive, *see Ceausu v. Progressive Cas. Ins. Co.*, 2013 WL 12131280, at *7 (C.D. Cal.

18  Oct. 10, 2013) (collecting cases from Ninth Circuit and California Supreme Court finding

19  the plain meaning of the term "may" is ordinarily understood in a permissive or

20  discretionary manner), even under Plaintiff's narrow interpretation, the Court finds the

21  Exclusion applicable.

22  Plaintiff does not dispute that the arbitration panel's order was a final adjudication

23  of QBE's claim against Plaintiff, thus falling within one of the listed sources.  Once again,

24  Plaintiff attempts to require a finding of liability, contending that the arbitration order is

25  insufficient for purposes of this Exclusion because "the panel never found QBE or

26

27

28  [2] Defendant does not agree with this assertion and argues that the endorsement was specifically written for Plaintiff.  Reply at 5.

[Plaintiff] acted in bad faith." Opp'n at 28. Once again, the Court must reject Plaintiff's untenable interpretation. As noted above, all that is required is an allegation of bad faith. In its opening brief, QBE raised a claim for bad faith against Plaintiff for its handling of the Cortes insurance policy. Knight Decl. Ex. 53. And the arbitration panel noted the extensive evidence QBE brought forth in support of that claim. Although the arbitration panel ultimately declined to find Plaintiff *liable* for bad faith, the *allegation* of bad faith handling of the Cortes insurance claim is clear on the face of the arbitration order.[3] Thus, the Court can determine the Claims Services Exclusions applies from a final adjudication of a proceeding constituting the claim.

Plaintiff makes a final plea against the conclusion that the exclusion applies, asserting that if the exclusion applies in this case, it would "strip [Plaintiff] of the 'No. 1 reason' it obtained insurance from Defendant in the first place"—coverage for bad faith liability. Opp'n at 27. Plaintiff argues that in circumstances where application of an exclusion would make coverage illusory, California courts have declined to enforce such exclusions. *Id.* But "[e]ven if [bad faith claims] are the predominant type of Claim envisioned under the policy," Plaintiff has "not shown that application of" the Claims Services Exclusion "would eliminate coverage entirely." *Jeff Tracy, Inc. v. U.S. Specialty Ins. Co.*, 636 F. Supp. 2d 995, 1007 (C.D. Cal. 2009). Without such a showing, the Court cannot say that the coverage is illusory. Moreover, Plaintiff is a sophisticated party whose entire business is handling insurance contracts. That Plaintiff signed this Exclusion is an indication it understood what the policy did and did not cover.

In sum, the Court concludes the Claims Services Exclusion applies.

///

///

---

[3] If the arbitration panel's Order is deemed to be insufficient to fall under this language, the Court still concludes that the Exclusion applies. This litigation is a "proceeding separate from or collateral to the Claim." The Court the finds that Plaintiff's coverage claim against Defendant arises out of and is related to QBE's allegation that Plaintiff handled the Cortes insurance claim in bad faith.

**B.**     *The Dishonest Act Exclusion*

Next, Defendant contends that the Dishonest Act Exclusion applies.     Under the Dishonest Act Exclusion:

> A)  No coverage will be available under this Policy for Loss or Defense Expenses, from any Claim or Disciplinary Proceeding:
>
>> (1) against any Insured brought about or contributed to by any dishonest or fraudulent act or omission or any willful violation of any statute, rule, or law by any Insured;
>
> . . . .
>
> The applicability of EXCLUSIONS A(1) and A(2) may be determined by an admission, final adjudication or a finding in the proceeding constituting the Claim or in a proceeding separate from or collateral to the Claim.

ACM Policy, § IV(A)(1).

Defendant contends the arbitration panel found Plaintiff "committed numerous acts of dishonesty." Mot. at 24.  These dishonest acts, argues Defendant, contributed to the panel's finding of liability for QBE's claim against Plaintiff.  *Id.*  Although the panel did not make an explicit finding of fraud, Defendant contends that "[t]he exclusion's language 'establishes the parties' intent to adopt an expansive [] Exclusion, not one that parses among different types of fraud.'"  *Id.* (citing *Nat'l Bank of Cal. v. Progressive Cas. Ins. Co.*, 938 F. Supp. 2d 919, 931 (C.D. Cal. 2013)).

Plaintiff responds, arguing that there has been "no admission, finding, or adjudication of fraud or dishonest conduct."  Opp'n at 29.  Plaintiff points to the panel's decision to decline QBE's punitive damages request based on any alleged fraud.  *Id.*  And even though the arbitration panel found several arguments advanced by Plaintiff "undermined [its] credibility," there was no finding that Plaintiff was intentionally dishonest.  *Id.*

///

///

A fair reading of the arbitration order, however, indicates the arbitration panel did, in fact, make findings of Plaintiff's dishonest conduct.

- The panel found that an email from Plaintiff telling QBE it had "not received a demand" was "not true." Arbitration Award at 5. The panel agreed with QBE's expert that this email was "disingenuous." *Id.* at 9.

- In what the panel called a "disturbing pattern," Plaintiff "apparently chose to withhold from QBE evidence of its own negligent performance." *Id.*

- The panel evaluated the testimony of Timothy Walker, QBE's expert witness, who "believ[ed] the failure to document [Plaintiff's] belated discovery of the demand letter and withholding this information from QBE was intentional . . . and that ACM's claims handling fell below industry standards with respect to its disclosure of facts to QBE." *Id.* at 9. The panel "agree[d] with Walker that ACM's lack of candor [was] stunning." *Id.* at 10.

- The panel found that the information Plaintiff provided to QBE, on which QBE based its defense of the Cardona matter, was "inadequate and misleading." *Id.* at 10.

- The panel noted that Plaintiff's repeated denials that it received the original demand letter on February 28, despite "incontrovertible" evidence indicating otherwise, "considerably undermined ACM's credibility." *Id.* at 9 n.9.

- In addressing punitive damages, the panel found "it egregious that ACM has repeatedly tried to conceal and misrepresent the fact of timely receipt of the letter demand from the Cardonas." *Id.* at 18.

- In rejecting Plaintiff's defense that QBE failed to mitigate its damages, the panel found "that ACM . . . concealed information that QBE would have needed to independently assess it risk and protect itself from extra-contractual liability to its insured." *Id.* at 14.

- The panel also found Plaintiff "misrepresented its counsel's prior success" with regard to the failed assignment when it tried to persuade QBE to agree to the

assignment scheme. *Id.* The manner in which the assignment was obtained was sufficient to "support a prima facie claim for fraud." *Id.* at 8.

The Court concludes these findings by the arbitration panel show dishonest acts or omissions sufficient to fall under the Dishonest Acts Exclusion.[4]

Plaintiff contends that even if it was dishonest, Defendant has failed to show any dishonest act "brought about or contributed to" QBE's claim. Opp'n at 29. Plaintiff argues that the panel found "QBE's losses were the direct result of ACM's failure to resolve the Cardona matter within policy limits," and "any conduct by ACM after the Cardonas' demand expired—including the arbitration itself—is incidental and could not have 'brought about' or even 'contributed to' QBE's claim." *Id.*

While much of the dishonest conduct occurred after Plaintiff's initial failure to immediately resolve the Cardona matter within policy limits, the dishonest conduct "contributed to" QBE's loss nonetheless. In rejecting Plaintiff's defense that QBE failed to mitigate, the panel found "that ACM . . . concealed information that QBE would have needed to independently assess its risk and protect itself from extra-contractual liability to its insured." Arbitration Award at 14. Without the necessary information, QBE was unable to limit the damages it sought from Plaintiff; it can therefore be said that the dishonest conduct contributed to higher damages. The panel also made explicit that its finding of liability under the contract was "based on the above evidence," which included the dishonest acts described above. *Id.*

Based on these findings, the Court concludes the Dishonest Acts Exclusion applies.

///

///

///

---

[4] To the extent the arbitration panel's findings do not meet the threshold for the Exclusion to apply, the Court makes those findings here. For purposes of determining whether the Exclusion applies, the Court finds that Plaintiff's dishonest acts or omissions, as outlined in this Order, contributed to Plaintiff's liability to QBE.

### C.    *The Contract Exclusion*

Finally, Defendant contends the Contract Exclusion bars coverage.  Mot. at 24–25. The Contract Exclusion reads as follows:

> (A)    No coverage will be available under this Policy for the Loss or Defense Expenses, from any Claim or Disciplinary Proceeding:
>
> . . . .
>
> > (7)    for any actual or alleged liability under any express contract or agreement, unless such liability would have attached in the absence of such contract or agreement.  For the purposes of this EXCLUSION (A)(7), an "express contract or agreement" is an actual agreement among the contracting parties, the terms of which are openly stated in distinct or explicit language, either orally or in writing, at the time of its making.

ACM Policy § IV(A)(7).

The Court previously found this exclusion applies because Plaintiff's liability arose under its contract with QBE.  *See* ECF No. 50 at 9.  The Court also found Plaintiff failed to meet its burden to show that an exclusion to the Contract Exclusion—which states that the Contract Exclusion does not apply if liability "would have attached in the absence of such contract or agreement"—applies.  *Id.*  The Court based this finding on Plaintiff's failure to "allege any facts that could support a claim that would impose liability in the absence of the contract between Plaintiff and QBE."  *Id.*  As part of its reasoning, the Court noted that the Arbitration Award was not part of the pleadings and therefore could not be considered for purposes of the motion to dismiss.  *Id.*

Now, on the current record, the Court finds that Plaintiff has met its burden to show liability would have attached absent the contract.  As Plaintiff noted, QBE asserted multiple extra-contractual claims against Plaintiff.  Opp'n at 30; *see also* Arbitration Award at 3. And the Court agrees the Arbitration Award establishes that liability would have attached absent the contract.  Therefore, the Contract Exclusion does not apply.

## II.   Bad Faith

Defendant moves to for summary judgment on Plaintiff's bad faith claims.  Mot. at 25–31.  Because the Court has determined there is no coverage, there can be no cognizable bad faith claim.  *Waller v. Truck Ins. Exchange Inc.*, 11 Cal.4th 1, 37 (1995) ("Because [insurer] was under no obligation to . . . indemnify the [underlying] action, it did not breach the implied covenant of good faith and fair dealing.").  The Court therefore **GRANTS** Defendant's motion as to Plaintiff's bad faith claims.

## III.   Duty to Defend

Next, Defendant asks the Court to enter judgment in its favor on Plaintiff's duty to defend claim.  Mot. at 31–32.  Although the Court finds there is no coverage because of policy exclusions, the duty to defend is still applicable because there was the potential for coverage.

An insurer must defend any action that seeks damages potentially covered by the insurance policy, either as alleged in the third-party complaint or known to the insurer at the time of the insured's tender of defense.  *Gray v. Zurich Ins. Co.,* 65 Cal. 2d 263, 275 (1996).  "When an insurer provides a defense to its insured, the insurer can be held liable if the defense it provides is inadequate, causing its insured losses which an otherwise adequate defense would have prevented, even though there is an ultimate determination the insurer had no duty to indemnify or defend."  *Love v. Fire Ins. Exch.*, 221 Cal. App. 3d 1136, 1152 (1990).  The duties required by the insurer when there is potential coverage include:

> (1) to make immediate inquiry into the facts of any serious accident as soon as practicable after its occurrence; (2) on the filing of suit against its assured to employ competent counsel to represent the assured and to provide counsel with adequate funds to conduct the defense of the suit; (3) to keep abreast of the progress and status of the litigation in order that it may act intelligently and in good faith on settlement offers.

*Merritt v. Reserve Ins. Co.*, 34 Cal. App. 3d 858, 882 (1973).  An insurer is not liable for appointed counsel's negligence unless counsel is instead controlled by the insurer and therefore not independent.  *See Travelers Ins. Co. v. Lesher*, 187 Cal. App. 3d 169, 191 (1986).

Plaintiff contends Defendant failed to satisfy its duty to defend because (1) its appointed counsel, Mr. Jampol, was not competent, and (2) Mr. Jampol was controlled by Defendant.  *See generally* Compl. ¶¶ 68–76.  Defendant contends that, as a matter of law, Mr. Jampol was competent, and Plaintiff has not raised sufficient evidence of control.  Mot. at 31–33.

First, the Court finds that Mr. Jampol was competent at the time of his appointment.  Jampol has practiced law in California since 1972.  *Id.* at 10–11 (citing Knight Decl. Ex. 73).  He is a certified specialist in legal malpractice, and his practice focuses on "insurance related matters."  *Id.* at 11 (citing Knight Decl. Ex. 73).  His experience includes over 50 cases tried to verdict, two of which involved bad faith.  *Id.*  These qualifications are sufficient for the Court to conclude that Jampol "was capable of adequately representing" Plaintiff.  *See Ghiglione v. Discover Prop. & Cas. Co.*, No. C 06 1276 SC, 2007 WL 963250, at *3 (N.D. Cal. Mar. 29, 2007) (assessing competency of appointed counsel based on counsel's experience at the time he was appointed).

Despite these qualifications, Plaintiff argues that the record evidence shows otherwise he was not competent.  Most of Plaintiff's evidence points to Jampol's actions after he was appointed as counsel.  *See* Opp'n at 24–25.  Evidence of mistakes made during the representation, however, is not instructive as to whether counsel was competent at the time he was appointed.  *Merritt*, 34 Cal. App. at 881–82 ("If [appointed] counsel negligently conducts the litigation, the remedy for this negligence is found in an action against counsel for malpractice and not in a suit against [the carrier that appointed him].").  The Court will therefore only consider Jampol's qualifications when he was appointed.

To this point, Plaintiff contends Jampol "had no experience with auto accident cases, and he never handled a bad-faith case involving the notorious law firm representing the

Cardonas." Opp'n at 25. This evidence does not show incompetence. Plaintiff gives no reason why an auto accident case such as this would be more complex than other bad-faith insurance claims that Jampol had experience handling. Nor does Plaintiff identify any skills or knowledge necessary to litigate an auto accident case that Jampol lacked. And Plaintiff points to no authority indicating that to be competent, appointed counsel must have experience litigating against the opposing counsel in that case. In sum, Plaintiff has not shown Jampol was not competent counsel at the time he was appointed.

Second, the Court finds Plaintiff failed to present sufficient evidence to show there is a material dispute of fact as to whether Defendant controlled Jampol during the representation. The Court notes that neither Party has found any case that has ruled on a claim that an insurer controlled its appointed counsel. And throughout the litigation, Plaintiff has not provided any standard for the Court to consider this claim under. Rather, Plaintiff has simply raised evidence that supports its arguments and claimed that is enough to find Defendant liable.

Defendant, on the other hand, has argued that in order for it to be found liable, the Court must find Jampol was a de facto employee, rather than the presumed independent contractor. Under California law, that determination is made using a multi-factor test, which primarily looks to whether the defendant "retain[ed] all necessary control" over the alleged employees day to day duties and operations. *See Ross v. Chipotle Mexican Grill, Inc.*, 2016 WL 7634445, at *9 (S.D. Cal. Aug. 8, 2016) (citing *S.G. Borello & Sons, Inc. v. Dep't of Indus. Relations*, 769 P.2d 399, 408 (1989)). The Court concludes the California Courts are likely to adopt this test if they ever confront such a claim.

Considering all the evidence in the light most favorable to Plaintiff, the Court finds Jampol was an independent contractor, not a de facto employee. Plaintiff has failed to put forward evidence sufficient to create a genuine dispute of material fact that Defendant controlled Jampol to such a degree as to create liability. Indeed, rather than control Jampol as an employee, Plaintiff's evidence is consistent with an insurer's "right to control a *defense*." *See also Centex Homes v. St. Paul Fire & Marine Ins. Co.*, 237 Cal. App. 4th

23, 31 (2015) (emphasis added).  For example, Plaintiff contends that because Jampol stated he had to get consent from Defendant before moving forward with various litigation decisions, this shows he was controlled.  Opp'n at 25 (citing Voris Decl. Ex. 73 at 807; Ex. 72 at 787).  But in every instance in which Jampol said this, he also stated he first discussed the decisions with and sought approval from Plaintiff.  *See* Voris Decl. Ex. 73 at 807; Ex. 72 at 787; *see also Centex Homes*, 237 Cal. App. 4th at 31 ("An insurer has the right to control a defense.").   Plaintiff also points out that Defendant "directed Jampol to a bilingual lawyer to present the assignment to Cortes."  Opp'n at 25.  But recommending a lawyer to help with an assignment that Plaintiff signed off on first is not an indication of control; instead, it indicates Defendant's interest in the outcome of the litigation and its right to control that litigation, not Jampol's decision making.  Finally, Plaintiff points to "Jampol's financial relationship" with Defendant, noting that Defendant appointed Jampol's firm "at least 63 times" in "ten years." *Id.*  But as Defendant points out, this type of relationship is not abnormal.  Mot. at 25.  Indeed, Plaintiff's independent counsel appointed after Jampol noted that he had been appointed by a different insurance company for "between 50 and 100 cases" over the past 10 years. *Id.*  And Plaintiff's own employee indicated that repeated assignment pf appointed counsel is encouraged.  Reply at 14.

In sum, Plaintiff's evidence fails to show that any decision Jampol made was carried out at the direct behest of Defendant without Plaintiff's approval.   Plaintiff instead asks the Court to pile inferences on top of one another to create a possible story in which Defendant controlled Jampol during the litigation.  Plaintiff "is alleging conclusions without substance, not facts." *Centex Homes*, 237 Cal. App. 4th at 32.  The Court finds there is no genuine dispute of material fact that Defendant satisfied its duty to defend.  The Court therefore **GRANTS** Defendant's Motion as to Plaintiff's duty to defend claim.

## IV.    Defendant's Counterclaims

Defendant's counterclaims seek reimbursement for payments made to Plaintiff under a reservation of rights.  Mot. at 25.  Defendant contends that it can recoup the $4,390,341 it paid Plaintiff on November 29, 2017. *Id.*  Defendant also contends it can

recoup the $605,569 it paid providing a defense because Plaintiff's claim was never covered, and the Claims Services and Dishonest Act Exclusions provide for reimbursement of defense costs if they apply. *Id.* The Court concludes Defendant is entitled to reimbursement of the coverage payment and defense costs.

## CONCLUSION

Based on the foregoing, the Court **GRANTS** Defendant's Motion for Summary Judgment (ECF No. 99) in its entirety. The Defendant's Motion for Judgment on the Pleadings (ECF No. 62) is **DENIED AS MOOT**.

**IT IS SO ORDERED.**

Dated:  September 3, 2020

Hon. Janis L. Sammartino
United States District Judge

18-CV-925 JLS (MDD)